## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### Danville Division

| | |
|---|---|
| GLAS TRUST COMPANY LLC, *in its capacity as Note Trustee*, <br><br> Plaintiff, <br><br> v. <br><br> CARTER BANK & TRUST, <br><br> Defendant. | Civil Action No. 4:24-cv-00005 <br><br><br> AMENDED COMPLAINT FOR VIOLATIONS OF VIRGINIA CODE §§ 55.1-400 AND 55.1-401 |

GLAS Trust Company LLC ("**GLAS**"), in its capacity as Note Trustee, brings this action to recover $226.2 million from legally improper transfers made by the Bluestone Entities (as defined below) to Defendant Carter Bank & Trust ("**Carter Bank**"), along with pre-judgment interest and other amounts payable under applicable law.  GLAS alleges the following on information and belief based on the investigation of GLAS's counsel.

Under Virginia Code §§ 55.1-400 and 55.1-401, GLAS is entitled to a judgment for the sum of fraudulent conveyances of monies that non-party Bluestone Resources, Inc. ("**Bluestone Resources**") and/or its subsidiaries Bluestone Coal Sales Corporation ("**Bluestone Coal Sales**") or Blackstone Energy, Ltd. ("**Blackstone Energy**", and together with Bluestone Resources and Bluestone Coal Sales, the "**Bluestone Entities**") made to Carter Bank, using the proceeds of financing extended by Greensill Capital (UK) Limited ("**Greensill UK**") to the Bluestone Entities, in satisfaction of debts for which the Bluestone Entities themselves were not legally liable.  As described further below, these transfers were unlawful as to creditors of the Bluestone Entities, including GLAS.

## NATURE OF THE ACTION

1.      This action involves fraudulent conveyances of monies from the Bluestone Entities to Carter Bank, which was engaged in aggressive efforts to collect on debt obligations of the Governor of West Virginia, James C. Justice II, his family, and his family businesses, including the Bluestone Entities.  GLAS does not assert that it was unlawful for the Bluestone Entities to use the proceeds of the financing extended to them by Greensill UK to satisfy *their own debts* to Carter Bank.  But it *was unlawful* for the Bluestone Entities (which were insolvent at the time or rendered insolvent) to transfer those proceeds to satisfy the debts of the Justice family and their other lines of business to Carter Bank for which the Bluestone Entities themselves were not liable, which is what occurred in an amount equal to at least $226.2 million.

2.      Carter Bank is a regional bank, headquartered in Martinsville, Virginia, and with branches in Virginia and North Carolina.  Founded in 1974 by Worth Harris Carter, Jr. as the First National Bank of Rocky Mount, Carter Bank has over 60 branches that offer a range of financial services.

3.      Bluestone Resources, Inc. and its subsidiaries ("**Bluestone**") are a network of coal-mining companies owned and operated by Governor Justice, Cathy L. Justice and James C. Justice III.  The Justice family owns over 100 companies in industries ranging from coal mining to hospitality to agriculture (the "**Justice Entities**").

4.      The Justice Entities have a longstanding financial relationship with Carter Bank. Worth Carter grew his banking business as the Justices grew their businesses.  Over the last two decades, Carter Bank became the Justice Entities' primary lender.  The businesses have substantial loans with Carter Bank, many of which are secured by collateral as well as personal guarantees of the Justice family.

2

5.      For the first 16 years of their financial relationship, the Justice Entities enjoyed a seemingly amicable lending relationship.  By early 2017, Carter Bank had extended over $750 million in Justice Entity loans.

6.      Carter Bank, whose primary source of revenue includes interest that it charges on its loans, made significant profits from its relationship with the Justice Entities, earning over $238 million in interest payments and fees from them.[1]

7.      By the time Worth Carter passed in April 2017, Carter Bank's financial situation had worsened.  By year end 2016, the bank's impaired loan balance had reached a peak of $639 million—nearly double the bank's market capitalization at the time of $349 million.[2]

8.      With new management in place, Carter Bank began tightening controls, including "aggressively dealing with numerous problem credits in the loan portfolio"[3] to "improve asset quality".[4]  Under this aggressive approach, Carter Bank was able to reduce its impaired loan balance by nearly $200 million by year end 2017.[5]

9.      The 2017 efforts, however, were not enough to achieve the financial metrics Carter Bank was targeting.  Carter Bank ended that year by acknowledging to shareholders that its financial performance "was not at a level we would characterize as successful".[6]  Not only did the bank continue to have substantial non-performing loan assets, but it was also "dealing with

---

[1] Complaint ¶ 6, *Bellwood Corp. v. Carter Bank & Trust*, No. 5:21-cv-00320 (S.D. W. Va. May 31, 2021), ECF No. 1 ("*Bellwood* Compl.").

[2] Carter Bank & Trust 2017 Form 10-K at 69.

[3] Carter Bank & Trust 2017 Annual Report, Letter to Shareholders.

[4] Carter Bank & Trust 2017 Form 10-K at 1.

[5] *Id.*

[6] Carter Bank & Trust 2017 Annual Report, Letter to Shareholders.

regulatory compliance deficiencies" and "other financial matters that could have lingering impacts to [its] long-term financial performance".[7]

10.      And so Carter Bank's new management continued tightening the reins on its customers, including the Justice Entities.

11.      Carter Bank began demanding additional protections for the Justice Entity loans, requiring the Justice Entities to agree to cross-default provisions, cross-collateralization and accelerated maturity dates.[8]  Because of the accelerated maturity dates, members of the Justice family, who had personally guaranteed a substantial portion of the loans and had provided confessions of judgment to Carter Bank to support those guarantees, were facing the threat that a missed payment could result in a near-immediate judgment against them.

12.      While Carter Bank was tightening terms on the Justice Entities, the Justices were trying to monetize their Bluestone assets.  Metallurgical coal prices soared in 2018, with U.S. coal exports hitting a five-year high that year.

13.      The Bluestone Entitles turned to Greensill UK for financing.  In June 2018, Bluestone Resources entered into a supply chain financing arrangement with Greensill UK, under which Greensill UK advanced it $70 million.

14.      A few months later, in September 2018, Bluestone Coal Sales entered into a receivables financing arrangement with Greensill UK (the "**Receivables Purchase Agreement**" or "**RPA**"), under which Greensill UK ultimately advanced an additional $780 million to the Bluestone Entities.

---

[7] *Id.*

[8] *Bellwood* Compl. ¶ 9.

15.     Immediately after Bluestone Coal Sales entered into the RPA, Bluestone Resources used a portion of the newly financed funds to pay off in full the long-term debt that Bluestone Resources owed to Carter Bank.  But rather than release the collateral that secured that debt, Carter Bank "forced" the Bluestone Entities "to pay off other unaffiliated debt" before it would release the Bluestone collateral.[9]

16.     With the property of their other businesses, as well as their own personal finances, on the line, the Bluestone owners chose to use the funds advanced by Greensill UK—in addition to the legitimate use of repaying Bluestone Resources' own debt to Carter Bank—to repay hundreds of millions of dollars of Carter Bank debt on which the Bluestone Entities themselves were not obligated.  Given their financial condition at the time (including as a result of the incurrence of material new financial obligations to make these repayments), such payments by the Bluestone Entities were unlawful.

17.     Specifically, the Bluestone Entities transferred three sums of monies to Carter Bank to pay off debts that the Bluestone Entities themselves did not owe (the "**Transfers**"). First, on or about September 28, 2018, at the time Bluestone Resources paid off its own Carter Bank debts, Bluestone Resources and/or Bluestone Coal Sales transferred an additional $8.6 million to Carter Bank that was not due on either of their loans.  Second, on or about December 13, 2018, the Bluestone Entities transferred approximately $179 million to Carter Bank to pay off the debts of several other Justice Entities (for which the Bluestone Entities themselves were not legally liable).  Third, between September 26, 2018 and December 31, 2018, as part of a single, integrated plan, the Bluestone Entities transferred approximately $38.6 million to two other Justice Entities, who in turn paid that money to Carter Bank to satisfy

---

[9] *Bellwood* Compl. ¶ 59.

those entities' senior secured loans (for which, again, the Bluestone entities themselves were not legally liable).

18.     The Bluestone Entities received nothing of value in exchange for any of these Transfers.  Quite the opposite.  The Bluestone Entities were insolvent at the time of the Transfers, and they sank deeper into insolvency as a result of them.

19.     Carter Bank—as the Justice Entities' longtime and near-exclusive lender—knew which Justice Entities owed which debts to it.  It knew which entities made the transfers, in respect of which loans, and the balances that were owed in connection with those loans.  Carter Bank knew that each of these transfers was made by entities that were not obligated on the loans they were repaying.  And it knew that the Bluestone Entities were insolvent at the time they made each of the transfers.  It ignored these red flags and "forced" the Justices to make these unlawful transfers anyway.  By the end of 2018, Carter Bank had further decreased its impaired loans by the *same amount* it had received from the Bluestone Entities, above and beyond what these entities actually owed Carter Bank.  That was a great result for Carter Bank, but a bad (and unlawful) result for the actual creditors of the Bluestone Entities, such as the creditors under the RPA.

20.     Each of these Transfers was an actual fraudulent conveyance under Virginia Code § 55.1-400 or, alternatively, a voluntary (constructive fraudulent) conveyance under Virginia Code § 55.1-401.

21.     These fraudulent conveyances hindered the ability of the Bluestone Entities' actual creditors, including the creditors under the RPA, to be repaid.  The instant causes of action arise from the RPA, and are brought by GLAS, as Note Trustee, which has been assigned all the rights of Bluestone's creditors under the RPA (the "**RPA Claims**").

22.     As noted above, Bluestone Coal Sales entered into the RPA with Greensill UK. In contemplation of a separate notes financing program that would be used to generate the funds advanced to Bluestone under the RPA (described further below), Greensill UK assigned the RPA Claims to a special purpose funding vehicle, HOFFMAN S.À R.L. (the "**Hoffman SPV**").  The Hoffman SPV in turn assigned all the RPA Claims to the Note Trustee.  As described further below, the RPA itself contemplated that these assignments would occur.[10]  The RPA Claims have not been further assigned, and therefore remain solely with the Note Trustee.

23.     The funds that Greensill UK advanced to the Bluestone Entities under the RPA were generated by the sale of notes issued by the Hoffman SPV under a notes financing program that is separate from the RPA (the "**Hoffman Notes**"), for which GLAS serves as Note Trustee. The Hoffman Notes were purchased by Credit Suisse Nova (Lux) acting in respect of its sub-fund, Credit Suisse Nova (Lux) Supply Chain Finance High Income Fund and Credit Suisse Virtuoso SICAV-SIF acting in respect of its sub-fund, Credit Suisse (Lux) Supply Chain Finance Fund (the "**CSAM Funds**") and Greensill Bank AG (in insolvency) ("**Greensill Bank**" and, collectively with the CSAM Funds, the "**Noteholders**").  The Hoffman Notes are secured by the RPA Claims and the Noteholders are ultimately entitled to the payments made by the Bluestone Entities under the RPA, but the RPA Claims have not been assigned to the Noteholders directly. Instead, the Hoffman Notes require that any enforcement of the RPA Claims be effected by the

---

[10] The RPA specifically permitted such assignments to any "Initial Identified Assignee" which is defined to include specific references both to the Hoffman SPV as well as to a trustee collateral agent acting for the benefit of holders of any notes, such as GLAS.  Specifically, the RPA states:  "Any of Greensill [UK] and Greensill Bank AG (and/or any of their affiliates) and any special purpose funding vehicles established for the purpose of (among other things) funding the purchase of receivables or other payment obligations purchased by Greensill [UK] or any of its affiliates, including (but not limited to) Hoffman S.à r.l. (as issuer under a note issuance program which may be utilized from time to time to fund certain Purchased Receivables purchased by Greensill [UK] hereunder), and any trustee collateral agent or similar party acting for the benefit of the holders of any notes, bonds or loan participations issued by any such special purpose funding vehicle."

Note Trustee.  The Noteholders have the right to instruct the Note Trustee to enforce the RPA Claims, as they have done here.

24.      The enforcement right in respect of the RPA Claims arose when, after the Bluestone Entities informed Greensill UK in March 2021 that they were no longer going to perform under the receivables program, Greensill UK went into bankruptcy, and the Noteholders stopped receiving payments due on the Hoffman Notes.

25.      GLAS, as Note Trustee, and the Noteholders took steps to mitigate their losses. In June 2022, they entered into a Standstill and Forbearance Agreement ("**Standstill Agreement**") in an effort to allow Bluestone to reinvigorate its coal production business, generate profitability (either through coal production or a sale of the Bluestone operations) and thereby enable the Bluestone Entities to repay the debts they owed.

26.      While the Bluestone Entities and members of the Justice family who guaranteed the Bluestone debts have made payments under the Standstill Agreement, at least $700 million remains outstanding.  The Noteholders have therefore instructed GLAS, as Note Trustee, to enforce their rights in respect of the RPA Claims through this action.

27.      Accordingly, GLAS brings this action seeking an *in personam* judgment against Carter Bank in the amount of the fraudulently conveyed sums, to be applied in partial satisfaction of the debts of the Bluestone Entities that are owed under the RPA.  In bringing this action, GLAS is acting in its capacity as Note Trustee under the Hoffman Master Trust Deed and Supplemental Master Trust Deed, defined below.  GLAS, as Note Trustee, has been assigned all claims arising under the RPA, from which the instant causes of action originate.  These claims have in turn been used to secure the Hoffman Notes, for which GLAS serves as Notes Trustee. GLAS, as Note Trustee, is responsible for, *inter alia*, enforcing the claims that secure the

Hoffman Notes, which it may do either in its own discretion or pursuant to instructions from the holders of the Hoffman Notes.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff GLAS Trust Company LLC is a citizen of a foreign state and Defendant Carter Bank & Trust is a citizen of the Commonwealth of Virginia, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

29.     GLAS Trust Company LLC is a limited liability company that is a citizen of the United Kingdom.  GLAS Trust Company LLC is a New Hampshire limited liability company and its sole member is GLAS USA LLC.  GLAS USA LLC is a New Jersey limited liability company and its sole member is Global Loan Agency Services Limited.  Global Loan Agency Services Limited is a United Kingdom limited company (the equivalent of a United States corporation) that is incorporated under the laws of England and Wales with its principal place of business in London, England.

30.     Venue is appropriate because Carter Bank is incorporated in the Commonwealth of Virginia and has its principal place of business in Martinsville, Virginia.

## PARTIES

31.     Plaintiff GLAS is acting as the Note Trustee under the Master Trust Deed, dated October 13, 2017, as supplemented by the Supplemental Master Trust Deed, dated December 21, 2017 (the "**Hoffman Master Trust Deed**").  GLAS, as Note Trustee, is a creditor of the Bluestone Entities.

32.     Defendant Carter Bank is a banking institution incorporated in the Commonwealth of Virginia with its principal place of business in Martinsville, Virginia.  It is

wholly owned by Carter Bankshares, Inc. Carter Bank is the initial and direct transferee of the fraudulent conveyances alleged herein.

33. Non-party Bluestone Resources, Inc. is a Delaware corporation with its headquarters in Roanoke, Virginia, and its principal place of business in West Virginia. Bluestone Resources is a party to, and debtor under, the Guarantee Agreement, dated September 26, 2018 (the "**Corporate Guarantee**"), through which Bluestone Resources and certain of its subsidiaries (the "**Bluestone Guarantors**") provided an absolute and unconditional guarantee of payment in respect of the payment obligations under the RPA. Bluestone Resources is also a party to and debtor under the Standstill Agreement.

34. Non-party Bluestone Coal Sales Corporation is a Delaware corporation with its principal place of business in West Virginia. Bluestone Coal Sales is a party to and a debtor under the RPA, Corporate Guarantee and Standstill Agreement.

35. Non-party Blackstone Energy, Ltd. is a Virginia corporation with its principal place of business in Virginia. Blackstone Energy is a party to and a debtor under the RPA, Corporate Guarantee and Standstill Agreement.

36. Non-party James C. Justice II is a resident and the sitting Governor of West Virginia and owns 60% of the ownership in the Bluestone Entities. Governor Justice (together with Cathy L. Justice) provided a joint and several, absolute, unconditional and irrevocable guarantee in respect of the payment obligations under the RPA. Governor Justice is also a party to and a debtor under the Standstill Agreement.

37. Non-party Cathy L. Justice is a resident of West Virginia and the current First Lady of West Virginia. Cathy L. Justice (together with Governor Justice) provided a joint and

several, absolute, unconditional and irrevocable guarantee in respect of the payment obligations under the RPA.  Mrs. Justice is also a party to and a debtor under the Standstill Agreement.

38.     Non-party James C. Justice III ("**Jay Justice**") is a resident of Virginia, is the CEO and President of each of the Bluestone Entities and owns 40% of the ownership interest in the Bluestone Entities.  Jay Justice provided an absolute, unconditional and irrevocable guarantee in respect of the RPA-related obligations, subject to a $70 million cap.  Jay Justice is also a party to and a debtor under the Standstill Agreement.

39.     Non-party Greensill Capital (UK) Limited is a limited company (the equivalent of a United States corporation) that is incorporated under the laws of England and Wales with its principal place of business in London, England.  Greensill UK is a party to and creditor under the RPA, and assigned the RPA Claims to the Hoffman SPV.

40.     Non-party HOFFMAN S.À R.L. is a private limited liability company (*société à responsabilité limitée*) that is incorporated under the laws of the Grand Duchy of Luxembourg. The Hoffman SPV's shares are entirely held by Stichting Lagoon Farm Hoffman, a foundation (*Stichting*) established pursuant to and governed by the laws of the Netherlands, and having its registered office in the Netherlands.  As a Dutch *Stichting*, Stichting Lagoon Farm Hoffman has no further members or owners.  The Hoffman SPV is a special purpose funding vehicle that was assigned the RPA Claims by Greensill UK, and further assigned the RPA Claims to the Note Trustee.  The Hoffman SPV is the issuer of the Hoffman Notes, which were used to fund the advances to Bluestone under the RPA.  The Hoffman SPV is not a trust.

41.     Non-party Citibank N.A. ("**Citibank**") is a national banking association with a charter address and main office located in Sioux Falls, South Dakota.  Citibank was replaced as Note Trustee of the Hoffman Notes by GLAS on December 17, 2021.

42. Non-party Credit Suisse Nova (Lux) is an investment company with variable capital (*société d'investissement à capital variable*) (the equivalent of a United States corporation) that is incorporated under the laws of the Grand Duchy of Luxembourg with its principal place of business in the city of Luxembourg. Credit Suisse Nova (Lux), along with the other Noteholders, purchased the Hoffman Notes, which were used to fund the advances to Bluestone under the RPA, and instructed GLAS, as Note Trustee, to bring the instant action pursuant to its rights under the Hoffman Notes.

43. Non-party Credit Suisse Virtuoso SICAV-SIF is an investment company with variable capital (*société d'investissement à capital variable*) (the equivalent of a United States corporation) that is incorporated under the laws of the Grand Duchy of Luxembourg with its principal place of business in the city of Luxembourg. Credit Suisse Virtuoso SICAV-SIF, along with the other Noteholders, purchased the Hoffman Notes, which were used to fund the advances to Bluestone under the RPA, and instructed GLAS, as Note Trustee, to bring the instant action pursuant to its rights under the Hoffman Notes.

44. Non-party Greensill Bank AG (in insolvency) is a stock corporation (*Aktiengesellschaft*) (the equivalent of a United States corporation) that is incorporated under the laws of Germany with its principal place of business in Bremen, Germany. Greensill Bank AG (in insolvency), along with the other Noteholders, purchased the Hoffman Notes, which were used to fund the advances to Bluestone under the RPA, and instructed GLAS, as Note Trustee, to bring the instant action pursuant to its rights under the Hoffman Notes.

## FACTUAL BACKGROUND

### A. Carter Bank's Longstanding Financial Relationship with the Justice Entities

45. In 1974, Worth Carter founded his first bank, the First National Bank of Rocky Mount.

46.     Between 1974 and 1998, Worth Carter organized and opened 10 new and separate community banks, consisting of 123 branches throughout Virginia and North Carolina.  All of these banks merged to create Carter Bank & Trust in December 2006.

47.     In a 2020 restructuring, Carter Bankshares, Inc. became the parent holding company of Carter Bank.

48.     In 2017, Carter Bank began selling off and closing a number of its branches. Today, Carter Bank operates in half of its historical physical locations.  Its 65 branches in Virginia and North Carolina offer a range of financial services.

49.     The Justice family has been operating businesses since 1971 and owns and operates over 100 businesses in industries that include coal mining, hospitality and agriculture.

50.     According to a complaint filed recently by various of the Justice Entities against Carter Bank, the Justice family and Carter Bank and its predecessor entities have had a close financial relationship since 2001, consisting primarily of commercial loan financing for the Justice Entities.  (Complaint ¶¶ 1, 11, *Greenbrier Hotel Corp. v. Carter Bank & Trust*, No. 5:23-cv-00731 (S.D. W. Va. Nov. 10, 2023), ECF No. 1 ("*Greenbrier* Compl.").)

51.     That relationship started with a single $4.5 million real estate loan in 2001, but grew exponentially over the next 16 years, as Worth Carter sought to grow his banking business, while the Justices grew their own array of businesses with financing from Carter Bank and its predecessors.  (*Id.* ¶¶ 1, 49.)

52.     The Justice Entities describe their relationship with Worth Carter as one of trust, based on "mutual expectations of good faith and honor", in which "a word and a handshake sufficed".  (*Id.* ¶ 11.)  Governor Justice "felt that he and his family business could rely on

13

Mr. Carter and his reputation to treat them fairly", a reputation that proved "absolutely true" "for nearly 16 years". (*Id.* ¶ 12.)

53.     By April 2017, the Justice Entities had grown their businesses with the help of loans provided by Carter Bank, and Carter Bank had profited substantially as a result.  By year end 2016, Carter Bank had extended the Justice Entities $775 million of credit. (*Id.* ¶ 55.)

54.     By April 2017, the Justice Entities had brought the outstanding amount down to $740 million. (*Id.* ¶ 56.)

55.     In April 2017, Worth Carter passed away.

56.     Worth Carter's passing triggered a shift in Carter Bank's approach to its long-standing loan portfolio.  The bank's new management implemented an aggressive strategy aimed at reducing its non-performing loan assets to improve its balance sheet.

57.     As Carter Bank's 2017 Form 10-K shows, by the end of 2016, the bank's impaired loans had reached a high of approximately $639 million.  (Carter Bank & Trust 2017 Form 10-K at 69.)  This was nearly double the bank's equity value, as its market capitalization at that time was only $349 million.

58.     Carter Bank's fiscal tightening in 2017 showed some results.  By the end of that year, its impaired loan balance was down to $446.7 million—nearly $200 million lower than it had been at the end of the previous year. (*Id.*)

59.     Despite these efforts, in its end-of-year letter to its shareholders accompanying its 2017 annual report, the bank's management conceded that its financial performance "was not at a level [it] would characterize as successful".

60.     This was because, as management explained in that letter, despite the paydown in its impaired loans, Carter Bank still had on its balance sheet substantial non-performing loan

assets.  And the bank was "dealing with regulatory compliance deficiencies" and "other financial matters that could have lingering impacts to [its] long-term financial performance".

61.     This fiscal failure in 2017 resulted in even more aggressive tactics by Carter Bank to pursue payment of its outstanding loans, including those owed by the Justice Entities.

62.     Many of the Justice Entities' debt obligations to Carter Bank were already backed by personal guarantees of the Justice family and collateralized with Justice Entity assets.

63.     Still, Carter Bank sought more, and began requiring the Justice Entities to provide additional security for their outstanding loans with Carter Bank, including cross-collateralization provisions in its loan agreements and obtaining confessions of judgment from members of the Justice family that Carter Bank could have entered in the event of a default.  Carter Bank also instituted, for the first time, cross-default provisions and accelerated loan maturity dates.  (*See Greenbrier* Compl. ¶¶ 4, 64, 133, 134.)

### B.     The Bluestone Entities Borrow $780 Million of Noteholder-Provided Funds

64.     In 2015, before Worth Carter's death and Carter Bank's enhanced collection efforts, the Justices purchased certain coal mining assets that are now owned and operated by Bluestone.  Those assets were subject to substantial reclamation and other obligations and required significant investment by Bluestone to mine and sell the coal reserves and achieve profitability.  (*See* Amended Complaint ¶ 3, *Bluestone Resources, Inc. v. Greensill Capital (UK) Limited, et al.*, No. 1:21-cv-02253 (S.D.N.Y. June 4, 2021), ECF No. 20 (the "*Bluestone* Compl.").)

65.     Bluestone Resources had taken out loans with Carter Bank to finance the purchase of the Bluestone assets.  According to Bluestone Resources' financial statements, by year end 2017, Bluestone Resources and its subsidiaries owed the sum of $59.4 million in what the

company's financial statements describe as long-term "bank" debt. This "bank" debt was owed to Carter Bank, which had become the Justice Entities' near-exclusive lender.

66.     In 2018, the Bluestone Entities entered into certain financing agreements with Greensill UK. Greensill UK was a financial services company focusing on supply chain financing and related commercial arrangements.

67.     In June 2018, Bluestone Resources entered into a supply chain financing arrangement with Greensill UK, pursuant to which Greensill UK advanced $70 million to Bluestone Resources.

68.     On September 26, 2018, Bluestone Coal Sales executed the RPA.

69.     On December 7, 2018, Blackstone Energy was added as a party to the RPA.

70.     The payment obligations of the Bluestone Entities under the RPA were backed by the Corporate Guarantee, executed on September 26, 2018, and reaffirmed on November 3, 2020.

71.     Those obligations were also personally guaranteed by members of the Justice family. Governor Justice and Cathy L. Justice provided a joint and several, absolute, unconditional and irrevocable guarantee in respect of the Bluestone Entities' payment obligations under the RPA. Jay Justice provided an absolute, unconditional and irrevocable guarantee in respect of the Bluestone Entities' payment obligations under the RPA, up to a maximum of $70 million.

72.     Under the RPA, Greensill UK ultimately advanced a total of $780 million to the Bluestone Entities (the "**RPA Funds**"). As described further below, the right to payment of the RPA Funds and all other claims arising under the RPA were ultimately assigned to the Note Trustee through a series of agreements executed in 2017.

73.     The funding for the RPA Funds was provided by the Noteholders pursuant to a separate notes financing program.  Specifically, Greensill UK organized the Hoffman SPV, which then issued the Hoffman Notes, which were in turn purchased by the CSAM Funds and Greensill Bank.  Greensill UK then used the funds generated from the Hoffman Notes purchases to advance the RPA Funds to the Bluestone Entities.

### C.     The Bluestone Entities Use RPA Funds To Repay Carter Bank Debts on which They Are Not Obligated

74.     The Bluestone Entities had control over how the RPA Funds would be used.  At the insistence of Carter Bank, the Bluestone Entities used portions of the RPA Funds to pay Carter Bank not only for the repayment of obligations the Bluestone Entities owed to Carter Bank, but also for debts of non-Bluestone Justice Entities for which the Bluestone Entities had no legal liability.  While these transfers benefited Carter Bank, the non-Bluestone Justice Entities and the Justices, who had guaranteed the non-Bluestone debts that were repaid, the transfers delayed, hindered and defrauded the Bluestone Entities' creditors under the RPA.

75.     After securing the initial Greensill UK supply chain financing in June 2018, Bluestone Resources invested a small portion of the funds advanced by Greensill UK into Bluestone, and immediately after executing the RPA, sought to repay the secured obligations that it owed to Carter Bank.

76.     On or about September 28, 2018, Bluestone Resources and/or Bluestone Coal Sales instructed Greensill UK to transfer approximately $68 million of newly advanced RPA Funds (repayment of which the Bluestone Entities were obligated to make) directly to Carter Bank to satisfy Bluestone Resources' outstanding long-term debt owed to Carter Bank—thereby reducing to zero one set of secured loans that the Justice Entities owed to the bank.

77.     But this transfer overpaid the amount due by Bluestone Resources.  According to Bluestone Resources' consolidated financial statements for years ended December 31, 2017 and 2018 ("**Bluestone's 2017 and 2018 Financial Statements**"), Bluestone Resources owed a total of $59.4 million in "obligations payable to banks" at the end of 2017—not the full $68 million that Carter Bank received.  The remaining $8.6 million was, thus, used to pay off debt on which neither Bluestone Resources nor Bluestone Coal Sales were legally liable or otherwise obligated. Yet Carter Bank retained those additional funds.

78.     Neither Bluestone Resources nor Bluestone Coal Sales received any consideration in exchange for this additional $8.6 million payment, let alone valuable consideration under the law.

79.     Indeed, rather than provide Bluestone Resources or Bluestone Coal Sales with any valuable consideration in exchange for this additional payment, Carter Bank took the opposite approach.  It refused to release the collateral that secured the $59.4 million loan that *had* been repaid.  Instead, Carter Bank demanded that the Justices also repay loans owed by other, non-Bluestone entities before it would release the Bluestone collateral.  In the words of the Justices:

> "[I]n September 2018, Defendant Carter Bank refused to release collateral in connection with a payoff of debt of one of the Justices' coal businesses (Bluestone Resources Inc.) and forced Plaintiffs to pay off other unaffiliated debt at Carter Bank in the amount of approximately $178 million in order to release such collateral." (*Bellwood* Compl. ¶ 59.)

80.     Under pressure from their largest creditor, the Justices complied.  On or about December 13, 2018, the Bluestone Entities instructed Greensill UK to transfer approximately $179 million of funds newly advanced to the Bluestone Entities under the RPA (repayment of which the Bluestone Entities were obligated to make) to Carter Bank to repay debts on which the Bluestone Entities were not legally liable or otherwise obligated.  Specifically, this transfer was

used to pay off debts owed to Carter Bank by other Justice Entities outside the Bluestone network, including A&G Coal Corporation, Alabama Carbon, Southern Coal Corporation, Kentucky Fuel Corporation and Virginia Fuel Corporation (the "**Legacy Companies**").

81.     While GLAS, in its capacity as Note Trustee, does not challenge the repayment of the $59.4 million of the Bluestone Entities' actual debt as an unlawful transaction, there was no fresh consideration to the Bluestone Entities in respect of the later, "forced" payment—funded to the Bluestone Entities with proceeds from the Noteholders, and used by the Bluestone Entities to pay Carter Bank.

82.     On information and belief, Carter Bank did not provide the Bluestone Entities any consideration in exchange for the $179 million transfer.  While Carter Bank may have released certain collateral securing the debt obligations of Bluestone Resources at that time, as it had informed the Justices it would do, those obligations had already been paid off in September 2018.  Therefore, any release of Bluestone collateral at that time was effectively in exchange for the prior payment of $59.4 million—not for the $179 million payment.

83.     Any assets that the Bluestone Entities received from the Legacy Companies as a result of the $179 million transfer did not come from Carter Bank and, in any event, was not consideration deemed valuable at law and was grossly inadequate consideration for the $179 million transfer to Carter Bank.

84.     Specifically, according to Bluestone Resources' 2017 and 2018 Financial Statements, Blackstone Energy purchased certain assets from the Legacy Companies for a total of $180 million in 2018.  This $180 million was funded by Greensill UK under the RPA and transferred to Carter Bank to repay the loans of the Legacy Companies.

85.     To the extent the mining assets that Blackstone Energy acquired from the Legacy Companies were in exchange for the $179 million payment made to Carter Bank on December 13, 2018, those assets were not valuable at law and were grossly inadequate consideration for the $179 million transfer to Carter Bank.

86.     A majority of the mines owned by the Legacy Companies were inactive, and those that were active were not projected to produce any coal (or cashflow) in at least the following several years.

87.     These assets were also subject to significant encumbrances, including reclamation liabilities.  Indeed, the assets of one of the five Legacy Companies—A&G Coal Corporation— were subject to approximately $134 million in reclamation liabilities, nearly 75% of the amount that Blackstone Energy reportedly paid for the Legacy Company assets.  According to Bluestone Resources' 2017 and 2018 Financial Statements and documents describing Bluestone related-party accounts, Bluestone Resources formed Blackstone Energy for the purpose of acquiring the mining assets from the Legacy Companies precisely to insulate Bluestone Resources (the parent company) from the liabilities attached to those assets.

88.     Blackstone Energy itself has assigned a negative value to these assets.  According to Bluestone Resources' consolidated balance sheet for the seven months ended July 31, 2021, Blackstone Energy reported assets of negative $60.4 million and total stockholders' equity of negative $74 million.

89.     The Bluestone Entities made a third payment with RPA Funds (repayment of which the Bluestone Entities were obligated to make) to Carter Bank for debts on which the Bluestone Entities were not legally liable or otherwise obligated.  According to Bluestone Resources' documents accounting for the use of the RPA Funds, Bluestone Resources

20

transferred, on an unidentified date, $38.6 million of the RPA Funds to Justice Entities Tams Management and Justice Low Seam Mining, which had senior secured loans in place with Carter Bank (for which the Bluestone Entities were not legally liable).  Those documents also show that the total sum of RPA Funds that were transferred to Carter Bank was approximately $282 million—roughly equivalent to the sum of (a) the $59.4 million that was paid to satisfy Bluestone Resources' debts to Carter Bank, (b) the $8.6 million payment on September 28, 2018, (c) the $179 million payment on December 13, 2018, and (d) the $38.6 million that the Bluestone Entities transferred to Tams Management and Justice Low Seam Mining.  The fact that these transfers nearly perfectly match the total amount of RPA Funds that the Bluestone Entities transferred to Carter Bank indicates, and GLAS alleges on information and belief, that the Bluestone Entities' transfers of $38.6 million of RPA Funds to Tams Management and Justice Low Seam Mining were part of a single, integrated plan to use RPA Funds to pay off loans for which the Bluestone Entities were not legally liable or otherwise obligated.

90.     Carter Bank's financial statements indicate that the $38.6 million transfer was made at some point between September 26, 2018 (when Bluestone Coal Sales executed the RPA), and the end of 2018 (when Carter Bank reported a decrease in its impaired loans of $285 million[11]).

91.     Intercompany advances pursuant to which all or some portion of the Transfers were effected were not expected to be repaid.

92.     With no expectation of repayment, the Bluestone Entities received no consideration, let alone consideration deemed valuable at law, in exchange for this $38.6 million

---

[11] Carter Bank & Trust 2018 Form 10-K at 81.

transfer that was used to repay debt obligations to Carter Bank on which the Bluestone Entities were not obligated.

93.     The Transfers did, however, benefit Carter Bank.  Carter Bank reduced its impaired loan balance from $446.7 million at the end of 2017 to $161.6 million at the end of 2018.  (Carter Bank 2018 10-K at 81.)  That decrease of approximately $285 million is nearly the exact sum of the above Transfers from the Bluestone Entities.

94.     The Transfers also benefited the Bluestone Entities' owners, who were personally obligated on many, if not all, of the Justice Entity loans that were repaid with the Transfers.  By the end of May 2021, the Justice Entities had repaid $368 million of their outstanding loans with Carter Bank.  (*Bellwood* Compl. ¶ 5.)  Approximately $285 million of those payments were made with RPA Funds, and at least $226.2 million of those payments were made to satisfy loans of other Justice Entities on which the Bluestone Entities were not obligated.

95.     While benefiting Carter Bank and the Bluestone Entities' owners, the Transfers directed Bluestone funds away from several creditors who were pursuing claims against the Bluestone Entities at or around the time of the Transfers, and impaired the ability of creditors of the Bluestone Entities (including creditors under the RPA) to be repaid.

96.     Bluestone Resources was, at the time of the Transfers, involved in arbitrating a dispute with Caroleng Investments Limited concerning royalty payments that Caroleng asserted Bluestone Resources owed it in connection with coal mined and sold from certain property that Bluestone Resources had acquired.  Caroleng filed its request for arbitration with the International Chamber of Commerce on April 10, 2018, claiming not less than approximately $6.7 million in damages.  On September 20, 2018—eight days before the Bluestone Entities

made the September 28, 2018 transfer to Carter Bank—the ICC set October 31, 2019 as the deadline to render a final arbitration award.

97.     In the second half of 2018, the Bluestone Entities were also defendants in various public lawsuits brought by former Bluestone employees for alleged violations of labor laws. Those lawsuits included a class action for violations of the Worker Adjustment and Retraining Notification Act filed in January 2017 against various of the Bluestone Entities, which was settled in July 2018 for over $1 million.  (Plaintiff's Motion to Approve Settlement, *Lester v. Pay Car Mining, Inc.*, No. 5:17-cv-00740 (S.D. W. Va. Aug. 10, 2018), ECF No. 58.)

98.     In the later part of 2018, Bluestone Resources was engaged in a contract dispute with First National Capital LLC, which resulted in Bluestone Resources' cessation of payments under that contract.  (Plaintiff's Original Petition and Application for Confirmation of Arbitration Award, *First National Capital, LLC v. Bluestone Resources, Inc.*, No. DC1918831 (Tex. Dist. Ct. Nov. 25, 2019).)  After First National Capital issued a notice of default, the matter was submitted to arbitration, and an arbitration award of over $2.7 million was entered against Bluestone Resources, and subsequently confirmed by the Texas district court.  *First Nat'l Cap., LLC v. Bluestone Res., Inc.*, 2020 WL 3124916, at *1 (Tex. Dist. Ct. May 27, 2020).

99.     Thus, while Carter Bank improved its impaired loan portfolio, the Transfers resulted in the redirection of substantial funds that could have been used to satisfy obligations to other actual creditors of the Bluestone Entities, including the creditors under the RPA, and to make investments in the Bluestone business in order to increase profitability and ensure the Bluestone Entities could satisfy their own (as opposed to their affiliates') debt obligations.[12]

---

[12] This Complaint does not seek recovery of the amount of RPA Funds that were used to satisfy actual obligations of the Bluestone Entities to Carter Bank (the approximately $59.4 million of bank loans reflected in Bluestone's financial statements).

100.    At the time of the Transfers to Carter Bank, the Bluestone Entities were insolvent, or became insolvent as a result of the Transfers.

101.    A company is considered insolvent if, among other tests, its assets—at fair market value—are worth less than the amount of its debt and other obligations (including contingent obligations).

102.    According to Bluestone Resources' consolidated financial statements for years ended December 31, 2018 and 2019 ("**Bluestone's 2018 and 2019 Financial Statements**"), Bluestone Resources' reported debts in 2018 totaled $804.6 million and in 2019 totaled $1.06 billion.  Bluestone's owners have also stated that Bluestone has had legacy liabilities that were not reported on its balance sheets.

103.    While the company reports in those financial statements that its assets were worth $1.5 billion in 2018 and $2.4 billion in 2019, the company's consolidated financial statements do not reflect the fair market value of the assets.

104.    The largest portion of the reported assets consisted of land and the physical mining assets themselves, including plants, equipment and mineral rights.  These assets accounted for $1.14 billion (or 76%) of Bluestone's assets in 2018 and $1.96 billion (or 82%) of Bluestone's assets in 2019.

105.    However, the book values for certain of Bluestone's mining assets far exceeded those assets' fair market value.  For example, the mining assets that Blackstone Energy reportedly acquired from the Legacy Companies in 2018 included primarily inactive mines saddled with reclamation liabilities, which were not projected to produce coal (or cashflow) at least through 2025.  Bluestone Resources' reported book values for certain mining assets purchased in 2019 (Pinnacle mining assets purchased from Mission Coal, and membership

24

interests in ERP Compliant Coke, LLC) are far in excess of the price that the company paid to purchase those assets.  Bluestone's owners also stated that Blackstone Energy's accounts receivable—included in the reported sum of Bluestone's consolidated 2018 assets—were likely uncollectable.

106.    Thus, when book values are converted to fair value and gains related to acquisitions that are not representative of fair value are removed, Bluestone Resources' stockholders' equity is negative.  On information and belief, at the time of each of the Transfers, the value of the Bluestone Entities' assets (adjusted to fair market value) was far less than the amount of the companies' liabilities.

107.    Bluestone Resources' financial statements for 2020 and the first quarter of 2021 tell a similar story.  In its consolidated balance sheets, the company continued to report approximately $2.3 billion in assets, but reported increasing debt—approximately $1.2 billion in 2020 and 1Q 2021.  Adjusted to fair market value, the company's assets were worth less than the amount of its debt.

108.    When the RPA Funds were used by the Bluestone Entities to pay off other Justice Entities' debts with Carter Bank, and as a result of those payments, the Bluestone Entities lacked sufficient capital to pay their operating expenses, capital expenditures and own debt repayment obligations.  As detailed above, Bluestone Resources' consolidated debt exceeded the value of the company assets in 2018 (*i.e.*, the period during which the Transfers occurred) through at least the first quarter of 2021 (*i.e.*, the period following the Transfers).  Bluestone Resources' consolidated financial statements and balance sheets[13] also show that the company's net income

---

[13] These include the company's consolidated financial statements for the years ended December 31, 2016 and 2017, Bluestone Resources' 2018 and 2019 Financial Statements, and Bluestone Resources' consolidated balance

fell significantly during that period:  from $158 million in 2017 to $19 million in 2018, and then

to negative net income in 2020 and 2021.  This drop in net income coincided with the coal

company's drop in mining output, which fell by more than 50% between 2017 and 2018.  As of

January 2022, cashflow from the Bluestone mining resources came from only four of the

Bluestone mining assets, three of which were experiencing substantial hardship and reduced

production scale.

109.    By not using the RPA Funds in a manner that would have actually benefited the

Bluestone Entities (and not principally Carter Bank), the Bluestone Entities were rendered

unable to satisfy their debt obligations under the RPA and otherwise.

**D.    The Noteholders Provide the Bluestone Entities with a Path Forward**

110.    By letter dated March 3, 2021, the Bluestone Entities informed Greensill UK that

they were "suspending [their] performance" under the RPA.

111.    In response, by letter dated March 6, 2021, Greensill UK informed Bluestone

Coal Sales that it was in default with respect to the RPA.

112.    On March 8, 2021, Greensill UK filed for insolvency in England, where it

remains in administration.

113.    The Hoffman SPV thereafter stopped making payments on the Hoffman Notes

held by the Noteholders.

114.    To mitigate their losses and work with the Justices to return the Bluestone mining

operations to profitability—thereby benefiting all involved—on June 24, 2022, GLAS, as Note

Trustee, and the Noteholders entered into the Standstill Agreement with the Bluestone Entities,

---

sheets and income statements for the twelve months ended December 31, 2020 and the twelve months ended
December 31, 2021.

Bluestone Guarantors and members of the Justice family who had guaranteed the RPA obligations.

115.    In the Standstill Agreement, the Bluestone Entities acknowledged and affirmed that the RPA and related guarantees are valid and enforceable contracts, and that the Bluestone Entities' obligations under the RPA and related guarantees are "legal, valid, binding, enforceable and non-avoidable obligations" of the Bluestone Entities.

116.    The Bluestone Entities also acknowledged that the payment obligations under the RPA (and, in turn, the Standstill Agreement) are owed to GLAS as Note Trustee.  To secure their performance under the Standstill Agreement, the Bluestone Entities provided confessions of judgment in the principal amount of $780 million in favor of GLAS as Note Trustee, in the event of an "Event of Default" under the Standstill Agreement.

117.    The Bluestone assets have not yet sold.

118.    The sum of at least $700 million in payment obligations under the RPA and related guarantees and, in turn, the Standstill Agreement remains due and owing.

119.    GLAS, as Note Trustee, is bringing this action to recover the RPA Funds that were fraudulently transferred to Carter Bank, to be applied in partial satisfaction of the debt obligations that the Bluestone Entities owe to GLAS, as Note Trustee, under the RPA, related guarantees and Standstill Agreement.

**E.    The Note Trustee Was a Creditor of the Bluestone Entities at the Time of the Challenged Transfers**

120.    The Note Trustee was a creditor of the Bluestone Entities at the time of the Transfers pursuant to three sets of agreements.

    1.    <u>All of Greensill UK's Rights Under the RPA Were Assigned to the Note Trustee Prior to the Transfers</u>

121.    First, the right to payment of the monies advanced by Greensill UK under the RPA was assigned to the Note Trustee through a series of agreements executed in 2017—prior to the Transfers to Carter Bank.

122.    In establishing its receivables financing program, Greensill UK entered into a Master Assignment Agreement dated December 21, 2017 (the "**Hoffman MAA**"), under which it "s[old], transfer[red], assign[ed], set over and otherwise convey[ed] absolutely with full title guarantee" to the Hoffman SPV "all of [Greensill UK]'s right, title and interest in, to and under each Payment Obligation, and all of [Greensill UK]'s Additional Rights relating thereto".

123.    "Payment Obligation" is defined as "a payment obligation owed by the Relevant Obligor", which is "each entity that is liable for payment of [the] Payment Obligation".  The Hoffman MAA therefore assigned to the Hoffman SPV all of Greensill UK's right, title and interest in, to and under the $780 million payment obligation under the RPA.

124.    The Hoffman MAA defines "Additional Rights" as, "in respect of any Payment Obligation, all of [Greensill UK]'s rights in respect of, or relating to, such Payment Obligation". Thus, the Hoffman MAA also assigned to the Hoffman SPV any additional rights that Greensill UK had related to the $780 million payment obligation under the RPA.

125.    As a result of this assignment, and in accordance with Paragraph 10(a) of the RPA, the Hoffman SPV became entitled to all of the rights of Greensill UK arising under the RPA (*i.e.*, the RPA Claims).[14]

---

[14] As described further below, the Hoffman SPV in turn assigned all of the RPA Claims to the Note Trustee.

126.    Greensill UK also granted a power of attorney ("**Greensill UK Power of Attorney**"), dated as of December 21, 2017, in favor of the Hoffman SPV and any persons serving as Note Trustee for the notes issued by the Hoffman SPV.

127.    Under that power of attorney, the Hoffman SPV and Note Trustee were both granted authority to "do any act, matter or thing which any Attorney considers necessary or desirable for the protection, preservation or enjoyment of that Attorney's interest in any Payment Obligation and the Additional Rights relating thereto".

128.    Using this power of attorney, the Hoffman SPV assigned to the Note Trustee all of the rights that it had acquired from Greensill UK under the Hoffman MAA.  This assignment was documented in the Hoffman Master Trust Deed.

129.    Pursuant to a Deed of Replacement and Appointment dated December 17, 2021 ("**Deed of Replacement and Appointment**"), GLAS replaced Citibank as the Note Trustee "for all purposes under and in connection with" the relevant documents, including the Master Trust Deed, Hoffman MAA and Greensill UK Power of Attorney, and assumed "all the duties and obligations of [Citibank] under and in connection" therewith.

130.    Pursuant to these agreements, GLAS, as Note Trustee, has been assigned all of Greensill UK's and the Hoffman SPV's rights and interests in the payment obligations under the RPA.  GLAS did not purchase these rights and interests, but rather stepped into the shoes of Citibank, which had served since 2017 as Note Trustee for the Hoffman SPV notes, pursuant to the Deed of Replacement and Appointment.

     2.  <u>GLAS Is an Intended Third-Party Beneficiary Under the RPA</u>

131.    Second, GLAS, as Note Trustee for the Hoffman Notes, was an intended third-party beneficiary of the payment obligations to Greensill UK under the RPA itself.  The RPA expressly contemplated that the RPA Claims would be assigned by Greensill UK for the benefit

of third-party investors and made repeated references to "Initial Identified Assignees", which are

defined in part as:

> any special purpose funding vehicles established for the purpose of
> (among other things) funding the purchase of receivables or other
> payment obligations purchased by Greensill or any of its affiliates,
> *including (but not limited to) Hoffman S.à r.l. (as issuer under a note
> issuance program which may be utilized from time to time to fund
> certain Purchased Receivables purchased by Greensill hereunder)*,
> and *any trustee collateral agent or similar party acting for the
> benefit of the holders of any notes*, bonds or loan participations
> issued by any such special purpose funding vehicle.   (Emphasis
> added.)

132.    Paragraph 10(a) of the RPA provides that, following any assignment to any Initial

Identified Assignee, such Initial Identified Assignee becomes a third-party beneficiary of the

rights of Greensill UK arising under the RPA.

133.    Through the various assignments detailed above, the Hoffman SPV assigned its

rights as an intended third-party beneficiary under the RPA to the Note Trustee, and GLAS

currently serves as the Note Trustee.

3.    GLAS and the Noteholders Are Creditors Under the Standstill Agreement

134.    Third, the Standstill Agreement provides for certain payments by the Bluestone

Entities and Justices—which include payments in respect of the payment obligations under the

RPA and related guarantees—that are to be made directly to GLAS, as Note Trustee, for the

benefit of the Noteholders.  As described above, the Bluestone Entities have provided

confessions of judgment in the amount of the $780 million that was advanced under the RPA

(subject to credit for payments made under the Standstill Agreement) in favor of GLAS as Note

Trustee, for the benefit of the Noteholders.

*        *        *

135.    The Note Trustee was a creditor of the Bluestone Entities at the time the RPA was executed, at the time that the Bluestone Entities used RPA Funds to repay debt obligations to Carter Bank that were owed by other, non-Bluestone entities (*i.e.*, the unlawful Transfers), and at the time the Bluestone Entities reaffirmed their debt obligations in the Standstill Agreement. GLAS, as Note Trustee, remains a creditor of the Bluestone Entities at the time of this lawsuit.

### F.    The Note Trustee Holds the RPA Claims.

136.    As described above, the Note Trustee has been assigned the RPA Claims pursuant to the Master Assignment Agreement and the Hoffman Master Trust Deed, and the RPA Claims have not been further assigned.

137.    Apart from this series of assignments, the RPA Claims also serve as collateral security for the Hoffman Notes.  As is standard in any notes financing program, the Noteholders have the right to instruct the Note Trustee to enforce the security underlying the Hoffman Notes, including the RPA Claims.[15]

138.    GLAS, as Note Trustee, commenced this action pursuant to an instruction received from the Noteholders to enforce the RPA Claims.  GLAS is therefore acting to enforce the causes of action that it holds in its capacity as Note Trustee.

### <u>FIRST CLAIM FOR RELIEF</u>

### Fraudulent Conveyance Under Virginia Code § 55.1-400

139.    Paragraphs 1 through 138 of this Complaint are incorporated herein as if fully set forth.

---

[15] Hoffman Master Trust Deed §§ 9.7, 11.  The Note Trustee has the right to refuse to enforce the RPA Claims even if presented with an appropriate instruction from the Noteholders, including if the Note Trustee determined that such enforcement would be contrary to the law of the relevant jurisdiction.  Hoffman Master Trust Deed § 11.2.  If the Note Trustee had so refused, the Noteholders' recourse would be to sue the Hoffman SPV, as issuer of the Hoffman Notes, because they have not themselves been assigned the RPA Claims.  Hoffman Master Trust Deed § 11.3.

140.    The Bluestone Entities made at least the three Transfers to Carter Bank that

constitute fraudulent conveyances under Virginia Code § 55.1-400:  (1) the transfer on or about

September 28, 2018 of $8.6 million to Carter Bank that did not repay debts on which any of the

Bluestone Entities were obligated; (2) the transfer on or about December 13, 2018 of

approximately $179 million to Carter Bank to pay off the debts of several other non-Bluestone

Justice Entities; and (3) the transfer made between September 26, 2018 and December 31, 2018

of $38.6 million to two other Justice Entities, who in turn paid that money to Carter Bank to

satisfy their senior secured loans.

141.    These Transfers are marked by several badges of fraud, evidencing the Bluestone

Entities' intent to delay, hinder or defraud their creditors other than Carter Bank.  Those badges

of fraud include at least the following:  (a) the Bluestone Entities were insolvent at the time of

each of the Transfers; (b) the Bluestone Entities were being pursued by their creditors at the time

of the Transfers; (c) the Transfers were made for the benefit of the Bluestone Entities' owners

and closely related parties (who had personally guaranteed both the Bluestone Entities'

obligations and the non-Bluestone Entity obligations to Carter Bank); and (d) the Bluestone

Entities received zero, or grossly inadequate, consideration in exchange for the Transfers, while

their owners benefited personally from the Transfers.

142.    *The Bluestone Entities were insolvent at the time of the Transfers*.  As detailed in

Paragraphs 100-109, the Bluestone Entities' debts exceeded their assets in 2018 (and indeed in

the period following the Transfers, from 2019 through at least the first quarter of 2021), and they

lacked sufficient capital to pay their operating expenses and capital expenditures and satisfy their

debt obligations.

143.    *The Bluestone Entities were being pursued by several creditors at the time of the Transfers*.  As detailed in Paragraphs 95-99, Caroleng Investments Limited had instituted an arbitration against Bluestone Resources seeking royalty payments, former employees had brought several lawsuits against the Bluestone Entities seeking damages, including at least one class action lawsuit, and First National Capital LLC was in a contract dispute with Bluestone Resources, which led to arbitration and an arbitration award against Bluestone Resources.  Carter Bank was also pursuing payment from the Bluestone Entities.

144.    *The Transfers were made for the benefit of the Bluestone Entities' owners and closely related parties.*  The Bluestone Entities are part of the more than 100 companies comprising the Justice Entities—all owned and operated by the Justice family.  The Transfers each were made to pay off debts that other, non-Bluestone Justice Entities owed to Carter Bank (which were personally guaranteed by members of the Justice family, including the owners of the Bluestone Entities), thus benefiting the closely related parties and owners of the Bluestone Entities.

145.    *The Transfers were not supported by valuable consideration*.  As detailed in Paragraphs 78-92, the Bluestone Entities received nothing from Carter Bank in exchange for the $8.6 million transfer made on or about September 28, 2018.  The Bluestone Entities received nothing from Carter Bank in exchange for the $179 million transfer made on or about December 13, 2018, and to the extent the Bluestone Entities received certain mining assets from other Justice Entities as a result of that transfer, those assets had negative book value and were grossly inadequate consideration for the $179 million payment of those Justice Entities' debt obligations.  The Bluestone Entities received nothing in exchange for the $38.6 million transfer to Carter Bank, which was effectuated by a single, integrated plan whereby the Bluestone

33

Entities transferred the monies to Tams Management and Justice Low Seam Mining, which then transferred the monies to Carter Bank.

146.    Carter Bank knew (or, as the near-exclusive lender to the overall Justice Entities, should have known) that the Transfers were made by insolvent entities with the intent of delaying, hindering or defrauding other creditors.  Carter Bank was the primary lender to the Justice Entities, and a lender to the Justice Entities for nearly two decades.  Through this relationship, Carter Bank knew that the Transfers were being used to pay off the debts of the Bluestone Entities' closely related parties on which the Bluestone Entities were not obligated (but on which the Bluestone Entities' owners were), knew that the Bluestone Entities were insolvent and incapable of repaying the substantial debts that they had recently incurred, including the RPA Funds, knew that the Bluestone Entities were being pursued by creditors (including by Carter Bank itself and other creditors via public lawsuits and arbitration before the International Chamber of Commerce) and knew that the Transfers were not supported by consideration valuable at law.  Carter Bank also refused to release the collateral that secured Bluestone Resources' debt upon repayment of that debt, and, by the Justices' own admission, they were "forced . . . to pay off other unaffiliated debt" before Carter Bank would release the Bluestone collateral.[16]  Carter Bank therefore knew that the Transfers were being made with the intent to delay, hinder or defraud other creditors of the Bluestone Entities.  At minimum, Carter Bank was on inquiry notice to investigate the bona fides of the Transfers and failed to do so.

147.    As detailed in Paragraphs 120-135, GLAS, as Note Trustee, was an existing creditor of the Bluestone Entities at the time of the Transfers.

---

[16] *Bellwood* Compl. ¶ 59.

148.     Alternatively, GLAS, as Note Trustee, is a subsequent or future creditor of the Bluestone Entities under the Standstill Agreement.  After each of the Transfers, the Bluestone Entities continued to incur debt under the RPA.  The Bluestone Entities received advances under the RPA (and incurred debt under the RPA) through March 1, 2021.  At the time of the Transfers (and through March 1, 2021), the Bluestone Entities were insolvent.  The Bluestone Entities, thus, reasonably believed that they could not repay the debt obligations they intended to contract under the RPA at the time of each of the Transfers.

149.     GLAS's claims are timely.  On September 25, 2023, Carter Bank entered into a tolling agreement that allows GLAS's claims to be brought any time prior to February 29, 2024.  This action was commenced on February 12, 2024.  (*See* Dkt. 1.)

150.     The Bluestone Entities are liable on GLAS's claim of payment of the outstanding debt that the Bluestone Entities owe under the RPA, Corporate Guarantee and Standstill Agreement, in the amount of at least $700 million.  This amount greatly exceeds the amount fraudulently conveyed to Carter Bank, and GLAS is entitled to a judgment against Carter Bank in the full amount of the fraudulent conveyances, plus pre-judgment interest and other amounts payable under applicable law.

## SECOND CLAIM FOR RELIEF

### Voluntary Conveyance Under Virginia Code § 55.1-401

151.     Paragraphs 1 through 150 of this Complaint are incorporated herein as if fully set forth.

152.     The Transfers by the Bluestone Entities to Carter Bank set forth above also constitute constructive fraudulent transfers (voluntary conveyances) under Virginia Code § 55.1-401:  (1) the transfer on or about September 28, 2018 of $8.6 million to Carter Bank that was not due on the Bluestone Entities' loans; (2) the transfer on or about December 13, 2018 of

approximately $179 million to Carter Bank to pay off the debts of several other Justice Entities; and (3) the transfer made between September 26, 2018 and December 31, 2018 of $38.6 million to two other Justice Entities, who in turn paid that money to Carter Bank to satisfy their senior secured loans.

153.    As detailed in Paragraphs 78-92, the Transfers were not made upon consideration deemed valuable at law.  The Bluestone Entities received nothing from Carter Bank in exchange for the $8.6 million transfer made on or about September 28, 2018.  The Bluestone Entities received nothing from Carter Bank in exchange for the $179 million transfer made on or about December 13, 2018.  Instead, Carter Bank "forced" the Bluestone Entities to transfer the $179 million in order to release collateral that secured the Bluestone Entities' debt with Carter Bank that had already been repaid.  To the extent the Bluestone Entities received certain mining assets from other Justice Entities as a result of that transfer, those assets had negative book value, were saddled with liabilities and were not expected to produce any cashflows.  They were not consideration valuable at law for the $179 million payment of the other Justice Entities' debt obligations.  The Bluestone Entities received nothing in exchange for the $38.6 million transfer to Carter Bank, which was effectuated by a single, integrated plan whereby the Bluestone Entities transferred the monies to Tams Management and Justice Low Seam Mining, which then transferred the monies to Carter Bank.

154.    As detailed in Paragraphs 100-109, the Bluestone Entities were also insolvent at the time of the Transfers, or rendered insolvent by the Transfers.  While the Transfers reduced the debts that other Justice Entities and the Justices themselves owed to Carter Bank, they increased the indebtedness of the Bluestone Entities under the RPA without doing anything to improve the Bluestone Entities' mining operations or otherwise enhance the Bluestone Entities'

ability to repay their obligations under the RPA.  With the RPA Funds being used to pay down the Justices' other debt to Carter Bank, rather than invested in the Bluestone mines, the Bluestone Entities reasonably knew that they could not repay the sums borrowed under the RPA. Indeed, without the necessary investment to turn the business around, the Bluestone Entities reported just $19 million in consolidated net income in 2018 and negative net income in both 2020 and 2021.

155.    As detailed in Paragraphs 120-135, GLAS, as Note Trustee, was an existing creditor of the Bluestone Entities at the time of the Transfers.

156.    GLAS's claims are timely.  On September 25, 2023, Carter Bank entered into a tolling agreement that allows GLAS's claims to be brought any time prior to February 29, 2024. This action was commenced on February 12, 2024.  (*See* Dkt. 1.)

157.    The Bluestone Entities are liable on GLAS's claim of payment of the outstanding debt that the Bluestone Entities owe under the RPA, Corporate Guarantee and Standstill Agreement, in the amount of at least $700 million.  This amount greatly exceeds the amount voluntarily conveyed to Carter Bank, and GLAS is entitled to a judgment against Carter Bank in the full amount of the voluntary conveyances, plus pre-judgment interest and other amounts payable under applicable law.

## PRAYER FOR RELIEF

A.    Award GLAS, as Note Trustee, an *in personam* judgment against Carter Bank in the amount, to be determined at trial, of the full amount of the actual fraudulent and/or voluntary (constructive fraudulent) conveyances by the Bluestone Entities to Carter Bank, plus pre-judgment interest and other amounts payable under applicable law.

B.      Award GLAS, as Note Trustee, all attorneys' fees and costs incurred in

prosecuting this action.

C.      Award such other relief as the Court deems just and equitable.

Dated:  April 19, 2024

Respectfully submitted,

/s/ D. Cameron Beck, Jr.

**McCANDLISH HOLTON, PC**
D. Cameron Beck, Jr. (VSB No. 39195)
Gibson S. Wright (VSB No. 84632)
1111 East Main Street, Suite 2100
Richmond, VA 23219
Telephone:  (804) 344-6322
Facsimile:  (804) 775-3800
cbeck@lawmh.com
gwright@lawmh.com

**CRAVATH, SWAINE & MOORE LLP**
Paul H. Zumbro (*pro hac vice*)
George E. Zobitz (*pro hac vice*)
Omid H. Nasab (*pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
pzumbro@cravath.com
jzobitz@cravath.com
onasab@cravath.com

*Counsel for Plaintiff GLAS Trust Company LLC, in
its capacity as Note Trustee*

39

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2024, I electronically filed the foregoing

Amended Complaint for Violations of Virginia Code §§ 55.1-400 and 55.1-401 with the Clerk of

Court using the CM/ECF system, which will send a notification of filing to all counsel of record.

/s/ D. Cameron Beck, Jr.
**McCANDLISH HOLTON, PC**
D. Cameron Beck, Jr. (VSB No. 39195)
1111 East Main Street, Suite 2100
Richmond, VA 23219
Telephone:  (804) 344-6322
Facsimile:  (804) 775-3800
cbeck@lawmh.com

*Counsel for Plaintiff GLAS Trust Company LLC, in its capacity as Note Trustee*