# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### DANVILLE DIVISION

|  |  |
|---|---|
| GLAS TRUST COMPANY LLC, *in its capacity as Note Trustee*, | |
| Plaintiff, | |
| v. | Civil Action No. 4:24-cv-00005 |
| CARTER BANK & TRUST, | |
| Defendant. | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO RULE 12(B)(1) AND RULE 12(B)(6)

Defendant Carter Bank & Trust ("Carter Bank"), by counsel, submits this Memorandum in Support of its Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure the Amended Complaint (the "Amended Complaint" or "Am. Compl.") filed by GLAS Trust Company, LLC, in its capacity as Note Trustee ("Plaintiff" or "GLAS").

## I.  INTRODUCTION

On February 12, 2024, GLAS filed a Complaint [ECF No. 1] seeking to recover $226.2 million in what it claims were fraudulent transfers made to Carter Bank by Bluestone Resources, Inc. The transfers in question were allegedly made using funds provided to the Bluestone Entities (defined below) by GLAS's predecessor in interest, the original lender Greensill Capital UK ("Greensill UK"), an international financing entity that became rather infamous after filing for insolvency protection in 2021 following the collapse of its high-risk lending practices. Those practices included making loans tied to "future" accounts receivables (i.e., based on receivables the borrower hoped or planned to generate in the future). The funds Greensill UK provided to the Bluestone Entities allegedly were obtained from various "Noteholders" to whom Greensill UK assigned—at some undefined point well after the 2018 transfers in question—its claims to repayment of the money advanced to the Bluestone Entities. These "Noteholders" were part of several different foreign investment entities' funds, each of which allegedly directed GLAS, as their "Note Trustee," to enforce such claims.

On March 29, 2024, Carter Bank filed a Motion to Dismiss [ECF No. 20] the original Complaint under Federal Rule of Civil Procedure 12(b)(1) because it failed to plead diversity jurisdiction. The original Complaint failed to allege facts sufficient to determine whether GLAS was a traditional trustee, whose citizenship could support diversity jurisdiction, or a "naked trustee," thus making the citizenship of the trust beneficiaries the basis for determining diversity

jurisdiction. Carter Bank also moved to dismiss the Complaint under Rule 12(b)(6) because the original Complaint failed to allege that the claimed fraudulent transfers were made by the debtor, the Bluestone Entities, as required by relevant Virginia's fraudulent and voluntary conveyance statutes.

GLAS did not oppose Carter Bank's Motion to Dismiss.  Instead GLAS chose to file an Amended Complaint (ECF No. 28) as a matter of right under Federal Rule of Civil Procedure 15(a). But the Amended Complaint does not cure the deficiencies in the original Complaint. Rather, it adds to the complexity, inconsistency, and opacity of the diversity analysis. The Amended Complaint includes new allegations relating to GLAS's rights as the "Note Trustee," but still fails to address squarely whether GLAS holds the rights of a "traditional trustee" or is a "naked trustee." Likewise, the Amended Complaint details the citizenship of some of the "Noteholders," but omits other entities and ignores the citizenship of the members or shareholders that make up these other entities. As a result, the Amended Complaint falls short of alleging sufficient facts to confirm the Court's diversity jurisdiction.

Similarly, the Amended Complaint fails to cure the substantive deficiencies in GLAS's fraudulent conveyance claims. While fixing the Complaint's failure to allege what entity made the first two challenged transfers to Carter Bank, the Amended Complaint's new allegation that *Greensill UK* made the first two challenged transfers—apparently with full knowledge that the funds were not all being used to pay the Bluestone Entities' debts—actually undermines GLAS's claims. Plainly, GLAS cannot plausibly allege that transfers made by its predecessor in interest, Greensill UK, were made "by the debtor" or could have been intended to defraud Greensill UK itself.

Moreover, the Amended Complaint's allegations regarding the assignments of the claims from Greensill UK to GLAS (or the Noteholders on whose behalf it purports to act) raise significant doubt about whether GLAS ever received a proper assignment of the claims it seeks to assert. Specifically, the Amended Complaint alleges a byzantine series of assignments of rights that took place in 2017, well before any rights Greensill UK acquired under the September 2018 Receivables Purchase Agreement ("RPA") did or could exist. GLAS endeavors to cure this problem by alleging that it and the Noteholders became Bluestone's creditors under a later "Standstill Agreement" entered with the Justice Entities (defined below) in 2022. But that did not occur until more than three years *after* the transfers in question, which would make GLAS a subsequent creditor not entitled to set aside the transfers under Virginia Code § 55.1-401.

In short, the Amended Complaint does not cure the deficiencies of the Complaint. It should be dismissed in its entirety both for failure to plead diversity and because it fails to state a claim under Virginia's fraudulent conveyance and voluntary conveyance statutes.

## II.   RELEVANT FACTUAL ALLEGATIONS

The Amended Complaint includes 157 paragraphs of allegations (138 of which purport to be factual) that attempts to describe several convoluted transactions involving numerous parties, some of which are not relevant to this Motion. Carter Bank accordingly limits the following summary of the facts alleged in the Amended Complaint to those directly relevant to its Motion to Dismiss.

A. **Allegations of Diversity of Citizenship**

GLAS alleges that it is the Note Trustee under a document entitled a "Master Trust Deed" dated October 13, 2017. Am. Compl. ¶ 31.[1] The Master Trust Deed has been "supplemented by the Supplemental Master Trust Deed, dated December 21, 2017." *Id.* Plaintiff defines these documents collectively as the "Hoffman Master Trust Deed." *Id.* The Amended Complaint asserts that Hoffman s.à.r.l., defined as the "Hoffman SPV," is not a trust (*id.* ¶ 40) but oddly does not identify or describe the nature of the trust for which GLAS serves as trustee. Given GLAS's designation as the "Note Trustee," the logical inference is that GLAS is a trustee under certain notes issued by the Hoffman SPV at some unidentified time. GLAS was not the Note Trustee at the time of the transfers in question. Rather, Citibank was the Note Trustee in 2018. GLAS claims to be the successor trustee under the Hoffman Master Trust Deed and Hoffman Notes. *Id.* ¶ 130 (alleging that GLAS "stepped into the shoes of Citibank, which had served since 2017 as the Note Trustee for the Hoffman SPV notes"). None of these notes or trust documents are attached to the Amended Complaint.

The Amended Complaint alleges that GLAS is a New Hampshire limited liability company with its principal place of business in New Jersey. *Id.* ¶ 29. GLAS's sole member is GLAS USA, LLC, which is a New Jersey limited liability company with its principal place of business in New Jersey. *Id.* GLAS USA LLC's sole member is Global Loan Agency Services Limited, which is a

---

[1] The Amended Complaint refers to and incorporates by reference several documents, including a "Master Trust Deed." GLAS attached none of these to the Amended Complaint. While Carter Bank has a copy of the RPA and the Standstill Agreement, and files them with this motion, Carter Bank does not have access to the Master Trust Deed or any of the other documents referenced in the Amended Complaint. Given the complicated and obscure nature of these documents and the fact that these documents are alleged to assign to GLAS (and the Noteholders) the claims being asserted and define the relative rights and obligations of "Noteholders," these documents are necessary for the Court to consider in confirming it has diversity jurisdiction. Accordingly, Carter Bank has, concurrently filed a separate motion seeking limited and targeted jurisdictional discovery.

United Kingdom ("UK") limited company. *Id.* Thus, the Amended Complaint alleges, GLAS is a citizen of the UK. *Id.*

The Amended Complaint alleges that the Hoffman SPV is a limited liability company incorporated under the laws of Luxembourg. *Id.* ¶ 40. The Hoffman SPV's shares allegedly are held entirely by Stichting Lagoon Farm Hoffman, a foundation governed by the laws of the Netherlands. *Id.* As a Dutch "foundation," Stichting Lagoon Farm Hoffman purportedly has no further members or owners. *Id.*

The Amended Complaint alleges that (i) Credit Suisse Nova (Lux) acting in respect of its sub-fund, Credit-Suisse Nova (Lux) Supply Chain Finance High Income Fund, and (ii) Credit Suisse Virtuoso SICAV-SIF, acting in respect of its sub-fund, Credit Suisse (Lux) Supply Chain Finance Fund (collectively, "the CSAM Funds"),[2] along with (iii) Greensill Bank AG (in insolvency) (collectively with the CSAM Funds, the "Noteholders") purchased the Hoffman Notes. *Id.* ¶ 23. Non-parties Credit Suisse Nova (Lux) and Credit Suisse Virtuoso SICAV-SIF are alleged to be investment companies organized under the laws of the Grand Duchy of Luxembourg. *Id.* ¶ 42-43. According to the Amended Complaint, these entities are "the equivalent of a United States corporation" (*id.*), although no support is provided for this assertion. The relationship of the two sub-funds to their parent funds is not described, nor does the Amended Complaint provide any information about the entity type or citizenship of the sub-funds.

---

[2] The Amended Complaint does not define CSAM. Carter Bank believes that it is Credit Suisse Asset Management (Schweiz) AG, as delegated portfolio manager for the "Funds." *See* Standstill and Forbearance Agreement, attached hereto as **Exhibit 1**. The Amended Complaint does not allege any facts about CSAM's form of entity or citizenship. Nor does it identify the relationship between GLAS, the Note Trustee, and CSAM, the delegated portfolio manager—both of whom purport to act on behalf of the CSAM Funds. *Id.*

The Amended Complaint alleges that Greensill Bank (in insolvency) is a German stock corporation with its principal place of business in Bremen, Germany (*id.* ¶ 44), although no information is provided about the form of the insolvency proceeding or the parties authorized to act on behalf of the insolvent entity.

**B.   Facts Alleged to Support Plaintiff's Claims**

1.   Background of the Contractual Relationships

Carter Bank is a longstanding lender to non-parties Bluestone Resources, Inc. ("Bluestone Resources"), Bluestone Coal Sales Corporation ("Bluestone Coal"), and Blackstone Energy Ltd. ("Blackstone") (collectively referred to as the "Bluestone Entities"), as well as other entities (the "Justice Entities") owned by James C. Justice, II, Cathy L. Justice, and James C. Justice, III. *Id.* ¶¶ 45-54. The Bluestone Entities are a network of coal-mining companies. *Id.* ¶ 3.

By year end 2017, according to the Amended Complaint, the Bluestone Entities owed Carter Bank $59.4 million in loan repayments. *Id.* ¶ 65. In June 2018, Bluestone Resources initiated a supply chain financing arrangement with Greensill UK, a financial services company focusing on supply chain financing "and related commercial arrangements," pursuant to which Greensill UK advanced $70 million to the Bluestone Entities. *Id.* ¶¶ 13, 66. In September 2018, Bluestone Coal entered into a receivables purchase agreement with Greensill UK,[3] pursuant to which Greensill UK ultimately advanced over the next two years an additional $780 million to the Bluestone Entities. *Id.* ¶¶ 14, 68, 72. On December 7, 2018, Blackstone was added as party to the RPA. *Id.* ¶ 69.

2.   Transfers GLAS Seeks to Declare Fraudulent or Voluntary

The Amended Complaint challenges three payments to Carter Bank.

---

[3] A copy of the RPA is attached as **Exhibit 2**.

First, on or about September 28, 2018, "Bluestone Resources and/or Bluestone Coal Sales *instructed Greensill UK* to transfer approximately $68 million of newly advanced RPA Funds (repayment of which the Bluestone Entities were obligated to make) directly to Carter Bank to satisfy Bluestone Resources' outstanding long-term debt owed to Carter Bank" thereby purportedly "reducing to zero" one set of secured loans the Justice Entities owed to Carter Bank. *Id.* ¶ 76 (emphasis added). However, according to GLAS, "this transfer overpaid the amount due by Bluestone Resources" by $8.6 million, because Bluestone Resources owed only $59.4 million to Carter Bank.[4] *Id.* ¶ 77. GLAS alleges that neither Bluestone Resources nor Bluestone Coal received any consideration in exchange for the additional $8.6 million payment. *Id.* ¶ 78. According to GLAS, Carter Bank "refused to release the collateral that secured the $59.4 million loan" and insisted on payment of additional debt. *Id.* ¶ 79.

Second, on or about December 13, 2018, the Bluestone Entities "*instructed Greensill UK* to transfer approximately $179 million of funds newly advanced to the Bluestone Entities under the RPA (repayment of which the Bluestone Entities were obligated to make) to Carter Bank to repay debts on which the Bluestone Entities were not legally liable or otherwise obligated." *Id.* ¶ 80 (emphasis added). GLAS further alleges "this transfer was used to pay off debts owed to Carter Bank by other Justice Entities outside the Bluestone network….." *Id.* The Amended Complaint asserts that, on information and belief,[5] no new consideration was given for this

---

[4] The evidence will show that this transfer actually paid Carter Bank $67,043,360.01 **on amounts due by Bluestone Resources, a fact well known to GLAS before the Complaint and Amended Complaint were filed**, however at this stage in the process, the Court must accept the allegation of overpayment of $8.6 million as true.

[5] The use of the "on information and belief" convention has no provenance in the Federal Rules of Civil Procedure.  It is typically used by litigants when they allege facts they hope or suspect exist, but for which they have no actual proof.

December 2018 transfer. *Id.* ¶¶ 81-82. Alternately, knowing that Bluestone did receive consideration in exchange for this payment,[6] GLAS alleges that any consideration received was "not valuable at law" and was "grossly inadequate consideration for the $179 million transfer to Carter Bank." *Id.* ¶ 83.

As the third payment alleged to be fraudulent, GLAS points to a transfer of $38.6 million of funds allegedly made by the Bluestone Entities "at some point between September 26, 2018 … and the end of 2018" to Tams Management and Justice Low Seam Mining, two other Justice Entities. *Id.* ¶¶ 89-90. Once again, "on information and belief" GLAS alleges that Tams Management and Justice Low Seam Mining "were part of a single, integrated plan to use RPA Funds to pay off their loans for which the Bluestone Entities were not legally liable or otherwise obligated." *Id.* ¶ 89. Thus, the Amended Complaint alleges **not that the Bluestone Entities** transferred funds to Carter Bank, but that the Bluestone Entities transferred funds to Tams Management and Justice Low Seam Mining which in turn then used those funds to pay $38.6 million on their obligations to Carter Bank between September 26, 2018 and the end of 2018.[7] *Id.* According to GLAS, these intercompany advances (presumably between the Bluestone Entities and Tams Management/Justice Low Seam Mining) "were not expected to be repaid." Thus, the Bluestone Entities allegedly received no consideration for them. *Id.* ¶¶ 91-92. Carter Bank allegedly benefited by the reduction in its impaired loan balance. *Id.* ¶ 93.

---

[6]  See paragraphs 85-88 of the Amended Complaint.

[7]  Despite GLAS's allegation "upon information and belief" of this specific payment of $38.6 million between September 26, 2018 and the end of 2018 by Tams Management and Justice Low Seam Mining to Carter Bank, no such payment to Carter Bank was made.  Once again, though, at this stage in the proceedings, Court must accept this allegation of fact as true.

According to GLAS, the three transfers outlined in the Amended Complaint were made to the detriment of **other** creditors of the Bluestone Entities. *Id.* ¶¶ 95-99. In addition, the Amended Complaint alleges that, at the time of the transfers to Carter Bank, the Bluestone Entities were insolvent or became insolvent as a result of the transfers. *Id.* ¶¶ 100-109.

3.   <u>Purported Assignment of Rights under the RPA to GLAS</u>

GLAS vaguely asserts that it "has been assigned all the rights of Bluestone's creditors under the RPA," which it defines as the "RPA Claims." *Id.* ¶ 21. Precisely how and when this assignment occurred, however, is unclear. The Amended Complaint alleges that "the right to payment of the monies advanced under the RPA was assigned to the Note Trustee through a series of agreements executed in 2017" (*id.* ¶ 121), although that is before the RPA even existed and before the challenged transfers were made to Carter Bank.[8] More specifically, the Amended Complaint alleges that Greensill UK entered into a Master Assignment Agreement (the "Hoffman MAA") pursuant to which it assigned to the Hoffman SPV all its rights, title, and interest to each "Payment Obligation." *Id.* ¶ 122.[9]  According to the Amended Complaint, "as a result of this assignment, and in accordance with Paragraph 10(a) of the RPA, the Hoffman SPV became entitled to all of the rights of Greensill UK arising under the RPA (the 'RPA Claims')." *Id.* ¶ 125. The Hoffman SPV, in turn, allegedly assigned to the Note Trustee—which at the time was Citibank, not GLAS—"all of the rights that it had acquired from Greensill UK under the Hoffman MAA." *Id.* ¶ 128. This assignment was documented in the Hoffman Master Trust Deed. *Id.*

---

[8]   None of the "series of agreements" relied on to establish the purported assignment of rights under the RPA (or the rights purportedly granted to the Note Trustee) is an exhibit to the Amended Complaint.

[9]   A "Payment Obligation" is defined as "a payment obligation owed by the Relevant Obligor," and "Relevant Obligor" is defined—in circular fashion—as "each entity that is liable for payment of [the] Payment Obligation." *Id.* ¶ 123.

Pursuant to a Deed of Replacement and Appointment, GLAS was substituted for Citibank as the Note Trustee on December 17, 2021. *Id.* ¶ 129. Pursuant to these agreements—none of which are attached to the Amended Complaint—GLAS "has been assigned all of Greensill UK's and the Hoffman SPV's rights and interests in the payment obligations under the RPA." *Id.* ¶ 130.

4. <u>Allegations of GLAS's Authority under the Hoffman Master Trust Deed and Hoffman Notes</u>

As set forth above, the Noteholders allegedly "instructed GLAS, as Note Trustee, to bring the instant action pursuant to its rights under the Hoffman notes." *Id.* ¶¶ 42-44. As Carter Bank pointed out in its initial Memorandum in Support of Motion to Dismiss [ECF No. 21], although GLAS alleged that it has certain "rights" and powers granted to it under the Hoffman Master Trust Deed and the Hoffman MAA (Am. Compl. ¶¶ 124-27),[10] GLAS failed to allege any facts supporting this assertion or provide a copy of the Hoffman Master Trust Deed or Hoffman MAA. The Amended Complaint continues to allege that GLAS brought this civil action based on instructions issued by the Noteholders. The only new allegations are that (1) the RPA Claims were assigned by Greensill UK to the Hoffman SPV, which then assigned them to the Note Trustee, and they remain solely with the Note Trustee (*id.* ¶ 23); and (2) the "Note Trustee has the right to refuse to enforce the RPA Claims even if presented with an appropriate instruction from the Noteholders…." *Id.* ¶ 137 n.15 (citing §§ 9.7 and 11 of the Hoffman Master Trust Deed); *see also* ¶ 27 ("GLAS, as Note Trustee, is responsible for, inter alia, enforcing the claims that secure the Hoffman Notes, which it may do either in its own discretion or pursuant to instructions from the holders of the Hoffman Notes.").

---

[10] These allegations remain essentially identical to those in ¶¶ 120-23 of the original Complaint. *See* comparison of original Complaint to Amended Complaint, attached hereto as **<u>Exhibit 3</u>**.

When the Bluestone Entities informed Greensill UK that they were suspending performance under the RPA on March 3, 2021, Greensill UK informed Bluestone Coal Sales that it was in default under the RPA. *Id.* ¶¶ 110-11. Significantly, it was at this point, according to GLAS, that "the enforcement right in respect of the RPA Claims arose." *Id.* ¶ 24. Almost immediately thereafter, Greensill UK went into insolvency in the UK, and the Hoffman SPV stopped making payments on the Hoffman Notes. *Id.* ¶¶ 24, 112-13.

To mitigate losses, GLAS and the Noteholders, along with other parties, entered into a Standstill Agreement with the Bluestone Entities in June 2022. *Id.* ¶ 114; Ex. 1, Standstill Agreement. While the Bluestone Entities allegedly have made payments under the Standstill Agreement, GLAS alleges that more than $700 million remains due and owing under the RPA, related guaranties, and the Standstill Agreement. *Id.* ¶ 116-18. By its claims in the Amended Complaint, GLAS seeks to recover $226,200,000.00 from Carter Bank.

### C. Causes of Action Alleged in the Amended Complaint

Based on the foregoing allegations, GLAS—acting at the direction of the Noteholders who purport to be the successors in interest to the original lender Greensill UK—asserts causes of action for fraudulent and voluntary conveyances under Virginia Code §§ 55.1-400 and 401. Specifically, in Count One, GLAS alleges that the three transfers to Carter Bank identified in the Amended Complaint are fraudulent conveyances as evidenced by several badges of fraud. *Id.* ¶¶ 141-145. In Count Two, the Amended Complaint alleges, in the alternative, that the transfers were voluntary conveyances under Virginia Code § 55.1-401 because they were not supported by consideration deemed valuable at law, *Id.* ¶ 153, and the Bluestone Entities were insolvent at the time of the transfers, *Id.* ¶ 154.

### III.   STANDARD OF REVIEW

#### A.  Rule 12(b)(1)

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit ([i.e.,] subject-matter jurisdiction)." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430-31, 127 S. Ct. 1184, 167 L. Ed. 2d 15 (2007). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Here, GLAS relies on diversity jurisdiction under 28 U.S.C. § 1332. Federal courts have subject-matter jurisdiction over controversies between "[c]itizens of different States" by virtue of Article III, Section 2 of the Constitution and 28 U.S.C. section 1332(a)(1). *Navy Federal Credit Union v. Ltd. Fin. Servs., LP*, 972 F.3d 344, 352 (4th Cir. 2020); *CityPlace Retail, LLC v. Wells Fargo Bank, N.A.*, No. 20-11748, 2021 U.S. App. LEXIS 21054, at *11 (11th Cir. July 15, 2021) (citing *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460 (1980)) (internal quotations removed).

GLAS bears the burden of proving that subject matter jurisdiction exists. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). A defendant may challenge subject matter jurisdiction under Rule 12(b)(1) either by contending that the Amended Complaint fails to allege sufficient facts upon which subject matter jurisdiction can be based or by alleging that the jurisdictional allegations of the Amended Complaint are not true. *Kerns v. U.S.*, 585 F.3d 187, 192 (4th Cir. 2009). Where the defendant contends that a complaint fails to allege facts upon which subject matter jurisdiction can be based, the facts alleged in the complaint "are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as [s]he would receive under a Rule 12(b)(6) consideration." *Adams*, 697 F.2d at 1219. Moreover, the Court must satisfy itself that it

has subject matter jurisdiction over this matter. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case."); *Monaco v. WV Parkways Auth.*, 57 F.4th 185, 187 (4th Cir. 2023).

### B. Rule 12(b)(6)

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court will accept as true all well-pled facts contained in the Amended Complaint. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009). However, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes." *Id.* (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). The Court must disregard "unwarranted inferences, unreasonable conclusions, or arguments." *Wahi v. Charleston Aera Med. Ctr., Inc.,* 562 F.3d 599, 615 n.26 (4th Cir. 2009). Dismissal is justified if an Amended Complaint "does not allege 'enough facts to state a claim to relief that is *plausible* on its face.'" *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir. 2008) (emphasis in original) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. A plaintiff must offer "more than labels and conclusions, and a formulaic recitation of elements of a cause of action will not do." *Id.*

Although extrinsic evidence generally is not considered at the Rule 12(b)(6) stage, "a court may consider a document attached to a motion to dismiss if 'it was integral to and explicitly relied on in the complaint and the plaintiffs do not challenge its authenticity.'" *Brooks v. Arthur*, 611 F. Supp.2d 592, 597 (W.D. Va. 2009) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). "'When the plaintiff attaches or incorporates a document upon which his claim is based,

14

or when the complaint otherwise shows that the plaintiff has adopted the contents of the document,' the court will credit the contents of the document over contradictory allegations in the complaint." *White v. Fed. Emergency Mgmt. Agency*, Civil Action No. 5:17-cv-21, 2017 U.S. Dist. LEXIS 192001, at *2 (W.D. Va. Nov. 21, 2017 (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016)). The Amended Complaint expressly relies on the RPA, Standstill Agreement and Tolling Agreement.  Plaintiff cannot dispute their authenticity.

## IV.  ARGUMENT

### A.  The Amended Complaint Fails to Plead Diversity Sufficiently

As Carter Bank pointed out in its original Memorandum in Support of its Motion to Dismiss [ECF No. 21], the Court must ensure that GLAS is the "real part[y] to [the] controversy for purposes of [the Court's] diversity jurisdiction." *Navarro*, 446 U.S., at 460; *U.S. Bank, N.A. as Tr. For RMAC Tr. Series 2016-CTT v. Desrosiers*, 17-CV-7338 (JMW), 2021 U.S. Dist. LEXIS 230131, at *7 (E.D. N.Y. Dec. 1, 2021). The rule that the trustee's citizenship is all that matters "applies only in circumstances where the trustee is a real party in interest to the controversy, meaning that it is an 'active trustee[] whose control over the assets held in [its] name is real and substantial.'" *Id.* (quoting *U.S. Bank Tr., N.A. v. Dupre*, 15-CV-0558 (LEK/TWD), 2016 U.S. Dist. LEXIS 127848 (N.D. N.Y. Sept. 20, 2016)). By contrast, "'naked trustees' who act as 'mere conduits' for a remedy flowing to others" are not the real party to the controversy. *CityPlace Retail*, 2021 U.S. App. LEXIS 210954, at *12 (quoting *Navarro*, 446 U.S. at 465). "When a plaintiff fails to show that a trustee's control over the trust assets is real and substantial, the citizenship of the trust's beneficiaries—rather than the citizenship of the trustee—controls the court's diversity analysis." *U.S. Bank, N.A.*, 2021 U.S. Dist. LEXIS 230131, at *7. Courts "decline to exercise jurisdiction when the trust agreement indicates that the trustee does not 'wield sufficient control

over the assets of the trust to be considered the real party in interest.'" *Wilmington Sav. Fund Soc'y v. Okunola*, 18-CV-2084 (AMD) (PK), 2023 U.S. Dist. LEXIS 234905, at *7 (E.D. N.Y. March 15, 2023) (quoting *U.S. Bank, N.A*, 2021 U.S. Dist. LEXIS 230131, at *7)); *Justice v. Wells Fargo Bank Nat'l Assn.*, 674 Fed. Appx. 330, 332 (5th Cir. 2016) (examining pooling and servicing agreement to determine amount of control vested in the trustee).

> 1. <u>The Amended Complaint Fails to Plead Facts Sufficient to Establish that GLAS is the Real Party in Interest</u>

The Amended Complaint—although it affirmatively states that the Hoffman SPV is not a trust—does not allege facts from which this Court can ascertain the true nature of the trust relationship between GLAS, as Note Trustee, and the Noteholders. Specifically, GLAS purports to act as a trustee under the Hoffman Notes pursuant to the Hoffman Master Trust Deed—and at the direction of the Noteholders. But the Amended Complaint fails to identify any specific "trust" over which GLAS acts as the trustee.  Nor does it plead facts or attach documents establishing the relationship between the Note Trustee and the Noteholders, or to allow the Court to determine whether GLAS has "real and substantial control" over the Hoffman Notes, or other assets held by the Noteholders. What remains clear from the Amended Complaint is that this is not a "traditional trust" arrangement, meaning that GLAS cannot simply rely on its own citizenship to demonstrate diversity unless it demonstrates that it is the real party in interest. *Americold Realty Trust v. Conagra Foods*, 577 U.S. 378, 383 (2016).

Although GLAS alleges that it has certain "rights" and powers under the Hoffman Master Trust Deed, the only "right" now specifically alleged is the purported right to refuse the instructions provided by the Noteholders.[11] Standing alone this allegation is insufficient to

---

[11] According to the Amended Complaint, "the Noteholders' recourse [for such a refusal] would be to sue the Hoffman SPV" (*id.* n.15), suggesting that the Noteholders have some indeterminate

demonstrate the kind of "control" the case law suggests is necessary to make the trustee the real party in interest. *U.S. Bank, N.A.*, 2021 U.S. Dist. LEXIS 230131, at *7 (trustee's control must be real and substantial). Moreover, these allegations conflict with the terms of the Standstill Agreement and the September 25, 2023, tolling agreement (the "Tolling Agreement") (*see* Am. Compl. ¶ 149) executed by Carter Bank, both of which are incorporated into and relied upon in the Amended Complaint.

The Standstill Agreement indicates that the claims against Carter Bank are held by the Noteholders (*see, e.g.*, Ex. 1, Annex I, p. 48 (definition of "Carter Bank Litigation" and "Claims"), and any releases of such claims are "By the Noteholders" (Ex. 1, § 12.1). It also suggests that GLAS's discretion is substantially limited. Ex. 1, Standstill Agreement §§ 14.1, 14.2 (Noteholders' instructions were necessary to commence this litigation); § 16.1(a) (the Note Trustees entered into the Agreement only in accordance with instructions and directions given by the Noteholders).

While the Standstill Agreement provides that "the rights, duties, discretions and liabilities of the Note Trustees … in respect of this Agreement are subject to the detailed provisions, exclusions and limitations set out in the Hoffman Master Trust Deed (in the case of GLAS as Note Trustee)" (*id.* § 16.1(d)), the Amended Complaint does not identify those "exclusions and limitations" on GLAS's rights. Likewise, the Tolling Agreement (attached hereto as **Exhibit 4**), which purports to toll the statute of limitations on the claims being asserted against Carter Bank, never mentions any Note Trustee.[12] In short, the Amended Complaint still does not demonstrate

---

contractual right to enforcement of the RPA Claims. The Court cannot determine what rights those are without the underlying Hoffman Master Trust Deed.

[12]  Carter Bank reserves its right to raise appropriate statute of limitations defenses if the Court determines it has proper jurisdiction over this matter and the Amended Complaint survives Carter Bank's Rule 12(b)(6) Motion.

that GLAS "wield[s] sufficient control over the assets of the trust to be considered the real party in interest." *Wilmington Sav. Fund Soc'y*, 2023 U.S. Dist. LEXIS 234905, at *7.

Instead, the allegations in the Amended Complaint, although opaque, support the conclusion that GLAS is a "'naked trustee[]' who act[s] as 'mere conduit[]' for a remedy flowing to others [here the Noteholders]." *CityPlace Retail*, 2021 U.S. App. LEXIS 210954, at *12 (quoting *Navarro*, 446 U.S. at 465). As GLAS plainly alleges, the Noteholders instructed GLAS to bring this action to recover funds that—if GLAS prevails—would flow to them. And the Standstill Agreement demonstrates that the Noteholders are parties with the apparent ability to sue on their own accord. Ex. 1 §12.1 (b), (c). *CityPlace Retail*, 2021 U.S. App. LEXIS 210954, at *10 (the relevant inquiry is whether the trust has jurisdictional-person status and can sue or be sued as an entity). In short, the Amended Complaint fails to allege facts demonstrating that GLAS is the "real and substantial part[y] to the controversy." *Navarro*, 446 U.S. at 460.

2. The Amended Complaint Insufficiently Identifies the Citizenship of the Noteholders

Perhaps realizing that it is not the real party in interest and that the Noteholders' citizenship is determinative, GLAS adds allegations to the Amended Complaint purporting to demonstrate the citizenship of the Noteholders. These allegations are insufficient for two reasons.

First, the Amended Complaint alleges that Credit Suisse Nova (Lux) and Credit Suisse Virtuoso SICAV-SIF are investment companies organized under the laws of the Grand Duchy of Luxembourg. *Id.* ¶ 42-43. Specifically, these entities are alleged to be sociétés d'investissement à capital variable, which GLAS asserts is the equivalent to United States corporations for citizenship determination. *Id.* But Carter Bank has found no legal authority supporting this contention. In cases where the test of citizenship is unclear, courts consider the citizenship of such entities as both U.S. corporations and limited liability companies. *See Frohnapfel v. Arecelormittal Weirton LLC*, Civil

Action No. 5:14-cv-45, 2014 U.S. Dist. LEXIS 193304, at *4-5 (N.D. W.Va. June 2, 2014) (where no authority specifically discussed whether an AB—a Swedish organizational form—should be treated as a corporation or an LLC, a court must assess citizenship under both tests); *Indus. Fuel Co. v. Invista S.A.R.L.*, No. 5:06CV40-V, 2008 U.S. Dist. LEXIS 19671, at *8 (W.D. N.C. Feb. 5, 2008) (assessing citizenship of a s.a.r.l. under both tests). Here, if these entities are treated as limited liability companies, the citizenship of their shareholders, members, or investors is relevant. *Id.* The Amended Complaint provides no facts that would enable the Court to assess that citizenship.

Second, the Amended Complaint omits, without explanation, other Noteholders identified in the Standstill Agreement. For example, the Standstill Agreement lists a "Wickham SA," which, like Hoffman S.a.r.l., (1) issued notes that provided funds that were used by Greensill UK to advance financing proceeds under the RPA (*id*. p. 1-2), (2) is included among the "Noteholder Released Parties" (*id.* § 12.2), and (3) has many of the same rights, obligations, and limitations as Hoffman S.a.r.l. with respect to recovery of funds based on the RPA claims. *Id.* §§ 16.1-16.2. Moreover, the Amended Complaint (and the Standstill Agreement) refers to various "sub-funds" (e.g., Credit Suisse Nova (Lux) Supply Chain Finance High Income Fund) but fails to explain the nature of those sub-funds and/or the relationship between the funds (e.g., Credit Suisse Nova (Lux)) and their "sub-funds." The nature of these parties, the identity of any shareholders, members or investors they may have, and their connection to the claims asserted in the Amended Complaint remains a mystery, raising further questions about the identity or identities of the real parties in interest and their citizenship.

GLAS has the burden to allege facts supporting this Court's diversity jurisdiction. Because GLAS fails to plead facts demonstrating the existence of diversity jurisdiction—and hence subject

matter jurisdiction over this matter—it fails to meet this burden.  The Amended Complaint should be dismissed under Rule 12(b)(1).

**B. The Amended Complaint Fails to Allege that GLAS Was a Creditor of the Bluestone Entities at the Time of the Transfers**

    1. <u>Plaintiff's voluntary conveyance claim must be dismissed because the Amended Complaint does not plead facts plausibly establishing that GLAS was a creditor of the Bluestone Entities before the transfers occurred</u>

Virginia's fraudulent and voluntary conveyances statutes are based upon England's Statute of 13 Elizabeth, enacted by the English parliament in 1570.  Virginia has chosen not to enact any of the more modern and creditor-friendly uniform laws governing fraudulent and voluntary conveyances.

To recover under Virginia Code § 55.1-401, GLAS must show that it had contracted debts—*i.e.*, was a creditor—at the time of the transaction at issue. The statute specifically states that "[e]ven though it is decreed to be void as to a prior creditor, because voluntary … it shall not, for that cause, be decreed to be void as to subsequent creditors or purchasers." *Id.*; *see also Barnes v. Vadico Terminals, Inc*., 408 F.2d 31, 34 (1969) ("In Virginia a voluntary transfer is voidable only as to prior or existing creditors."); *C.F. Trust v. Peterson*, No. 97-2003-A, 1999 U.S. Dist. LEXIS 22623, at *32 (E.D. Va. Jan. 8, 1999) (the Virginia legislature did not intend assignees to have the right to bring claims for voluntary conveyance). The fraudulent and voluntary conveyance statutes "target conveyances that prejudice 'creditors' of the transferor." *Grayson v. Westwood Bldgs., L.P*., 300 Va. 25, 51, 859 S.E.2d 651, 666 (2021) (quoting Va. Code §§ 55.1-400 to -401). GLAS alleges that it was a creditor at the time of the transfers (*id.* ¶ 28) and is an intended third-party beneficiary under the RPA. *Id.* ¶¶ 131-133. The Amended Complaint, however, does not state facts supporting these claims.

To support its claim that the RPA Claims were properly assigned to GLAS, the Amended Complaint points to a combination of (i) assignments made in 2017 pursuant to a "series of agreements" not fully described or attached to the Amended Complaint, and (ii) Section 10(a) of the RPA. But the Amended Complaint fails to allege exactly when such an assignment occurred after the RPA came into existence. Specifically, the Amended Complaint alleges that "the right to payment of the monies advanced under the RPA was assigned to the Note Trustee through a series of agreements executed *in 2017*." Am. Compl. ¶ 121 (emphasis added). Other than the Hoffman MAA and a Greensill UK Power of Attorney document (*id.* ¶ 126), the Amended Complaint does not identify any other document in the "series of agreements executed in 2017," and none of these agreements is attached to the Amended Complaint. Nevertheless, GLAS's allegations make clear that the purported assignments predated execution of the RPA by at least a year. Put differently, at the time the Note Trustee purportedly acquired "rights" under some "series of agreements" from 2017, the Bluestone Entities had no obligation whatsoever to Greensill UK, let alone to the Noteholders or Note Trustee. The "rights" assigned therefore could not have included the right to payment under the RPA—a document that did not exist at the time.

What is more, far from helping GLAS, Section 10(a) of the RPA makes clear that assignment of any right to payment under the RPA could take place only *after* the RPA was executed (thereby binding Bluestone Coal to its terms) and funds were advanced to Bluestone Coal or Blackstone. Only then could the Bluestone Entities have any "payment obligation" to Greensill UK that it could further assign.[13] As noted above, GLAS points to § 10(a) of the RPA to support

---

[13] It should go without saying that a party cannot owe money to another party on a loan that has not yet been agreed to or funded. In other words, one cannot have a right to payment under a contract until that contract is executed and any conditions set forth therein are met. A "right to payment" is "nothing more nor less than an enforceable obligation." *Cohen v. De La Cruz*, 523 U.S. 213, 218 (1998) (internal quotations removed).

the alleged assignment to the Note Trustee (Am. Compl. ¶¶ 125, 132), but § 10(a) (like the rest of the RPA) never mentions any pre-existing assignments and, instead, contemplates *future* assignments. Section 10(a) provides that Greensill UK "*shall have* the right without consent of or notice to [Bluestone Coal] to sell, transfer, negotiate, or grant participations in all or any part of, any interest in, any Purchased Receivable, or in [Greensill UK's] obligations, rights, interest and benefits hereunder…." Ex. 2, RPA § 10(a) (emphasis added). Likewise, § 10(a) lists the "Initial Identified Assignees"[14] as parties to whom Greensill UK's rights, title, and interest under the RPA, "*may be assigned or participated* … pursuant to one or more purchase, participation or similar transfer agreements." *Id.* (emphasis added).  Further, the parties to the RPA agreed that "*following* any such sale, assignment or transfer by [Greensill UK] to any of the Initial Identified Assignees (or any other permitted assignee or participant hereunder)" such assignees "shall be third party beneficiaries of the rights of [Greensill UK] arising hereunder…." *Id.* (emphasis added). Greensill UK was obligated to maintain a "Register" on which it "shall record the rights of [Greensill UK]

---

[14] The "Initial Identified Assignees" are defined as:

> Any of Greensill [UK] and Greensill Bank AG (and/or any of their affiliates) and any special purpose funding vehicles established for the purpose of (among other things) funding the purchase of receivables or other payment obligations purchased by Greensill [UK] or any of its affiliates, including (but not limited to) Hoffman s.à.r.l. (as issuer under a notes program which may be utilized from time to time  to fund certain Purchased receivables purchased by Greensill [UK] hereunder), and any trustee collateral agent or similar party acting for the benefit of the holders of any notes, bonds or loan participations issued by any such special purpose funding vehicle.

Ex. 2 at A-5.

and any assignee or participant of [Greensill UK] under this Agreement, and each assignment or participation." *Id.* §10(b).[15] This is the plain wording of the RPA.

The RPA thus contemplated the assignment of rights in the Purchased Receivables ***after*** execution of the RPA and the advance of funds thereunder to Bluestone Coal. Plainly, the RPA Claims could only arise after execution of the RPA, yet nowhere does the Amended Complaint allege that Greensill UK made any actual assignment of the RPA Claims ***after*** Greensill UK acquired them or that the Note Trustee (or Noteholders) were ever listed on the "Register" as required by ¶ 10(a) of the RPA.[16]

Once again recognizing a problem with its pleading, the Amended Complaint alleges alternatively, as yet another backup plan, that GLAS and the Noteholders are creditors under the Standstill Agreement. But the Standstill Agreement was executed on June 24, 2022—***more than three years after*** the transfers alleged to be fraudulent. The Amended Complaint includes no allegations addressing how the 2022 Standstill Agreement could make GLAS and/or the Noteholders "creditors" at the time of 2018 payments to Carter Bank.

In short, the Complaint fails to allege any assignment of Greensill UK's rights acquired under the RPA to GLAS in time for GLAS to be a "creditor" at the time of the challenged transfers. Likewise, to the extent GLAS claims creditor status under the Standstill Agreement, it is

---

[15] The Register was to include the names and addresses of assignees, participants or successors "and the percentage or portion of such rights and obligations assigned or participated." *Id.*

[16] As a backup plan, GLAS also alleges that it is a "third-party beneficiary" under the RPA. Am. Compl. ¶¶ 131-33. This theory also falls short, however, because under § 10(a) of the RPA any third-party beneficiary rights arise only after and as a part of any assignment of any claims or rights under the RPA. Thus, standing alone, GLAS' purported third-party beneficiary status cannot support its voluntary conveyance claim.

indisputably a "subsequent creditor." Accordingly, GLAS cannot recover under Virginia Code § 55.1-401 and its voluntary conveyance claims (Count Two) must be dismissed.

2. <u>Because Plaintiff is a subsequent creditor, the Amended Complaint fails to plead facts showing that the Bluestone Entities intended to defraud the Noteholders</u>

For subsequent creditors, the fraudulent conveyance statute requires that the debtor made the conveyance "with intent to delay, hinder, or defraud creditors." Va. Code § 55.1-400; *Grayson*, 300 Va. at 51, 859 S.E.2d at 666. "A different paradigm governs allegations of fraudulent conveyances that occur *before* the debtor-creditor relationship exists." *Id.* A subsequent creditor must show actual fraudulent intent and that a "prospective fraud was contemplated and directed against" the subsequent creditor. *Id.* at 52, 859 S.E.2d at 667 (citing *Gray v. McCormick*, 181 Va. 52, 60, 23 S.E.2d 803, 807 (1943)). In other words, the plaintiff must show that the debtor has an intent to avoid the payment of debts to those to whom he expects to become indebted in the future. *Id.* at 52-53, 859 S.E.2d at 667 & n.16. "The burden is not an easy one to shoulder." *Id.* at 53, 859 S.E.2d at 667 (citing *Allsbrook v. Azalea Radiator Serv., Inc.*, 227 Va. 600, 603-04, 316 S.E.2d 743, 744-45 (1984) ("[E]ven if there had been a transfer from the [putative debtor] to [a grantee] concerning the truck, it occurred *before* any indebtedness to [the remote future creditor]; therefore as regards [the remote future creditor], there could not exist any intent to defraud.") (alterations in original)).

The Amended Complaint fails to allege facts establishing that the Bluestone Entities made the challenged transfers with actual intent to defraud GLAS or the Noteholders.[17] The Bluestone Entities did not even know of the existence of the Noteholders or "Greensill Capital's purported

---

[17] Indeed, as set forth above, two of the three challenged transfers were actually made by GLAS's predecessor in interest, Greensill UK. Thus, GLAS must show that transfers it made were intended to defraud itself.

obligations to funds managed by the Swiss banking group Credit Suisse relating to Bluestone's …

receivables" until February 9, 2021—shortly before Greensill UK's financial collapse. *Bluestone*

*Resources, Inc. v. Greensill Capital (UK) Limited, et al.*, No. 1:21-cv-02253 (S.D. N.Y. June 4,

2021), ECF No. 20, ¶ 23.[18] Accordingly, the Bluestone Entities could not have had any actual

intent to defraud GLAS or the Noteholders.  GLAS cannot assert a claim under Virginia Code

§ 55.1-400.  Count One of the Amended Complaint must be dismissed.

### C.  GLAS Fails to Plead Facts Demonstrating a Transfer from the Debtors, the Bluestone Entities, With Respect to any of Transfers

Virginia Code § 55.1-400 requires that a transfer be made "with intend to delay, hinder, or

defraud creditors, purchasers, or other persons…." To have a conveyance declared void, a plaintiff

must demonstrate "(1) a conveyance, (2) given with intent to hinder, delay or defraud creditors,

(3) who were lawfully entitled to the subject of the conveyance, and (4) the purchaser did not

provide valuable consideration or had knowledge of the fraud or fraudulent intent of the

immediately ***prior grantor***." *CT Trust v. Peterson*, No. 1:97-CV-02003, 1999 U.S. Dist. LEXIS

22623, at *23 (E.D. Va. Jan. 8, 1999) (emphasis added). Fraudulent intent may be demonstrated

by reference to possible "badges of fraud." *Id.* at *24. The badges of fraud include "(1) retention

of an interest in the transferred property ***by the transferor***; (2) transfer between family members

for allegedly antecedent debt; (3) pursuit ***of the transferor*** or threat of litigation by his creditors at

the time of the transfer; (4) lack of or gross inadequacy of consideration for the conveyance; (5)

retention or possession of the property ***by the transferor***; and (6) fraudulent incurrence of

indebtedness after the conveyance." *Id.* (quoting *Hyman v. Porter*, 237 B.R. 56, 63 (Bankr. E.D.

Va. 1984) (emphasis added); *see Fox Rest Assocs., L.P. v. Little*, 282 Va. 277, 285, 717 S.E.2d

---

[18]  The Amended Complaint refers to and substantially relies upon the Amended Complaint filed
in *Bluestone Resources, Inc. v. Greensill Capital (UK) Limited, et al.*  Am. Compl. ¶ 64.

126, 135 (2011). Additional badges of fraud are a "close relationship of the parties" between whom the transfer is made and "insolvency *of the grantor*." *C.F. Trust*, 1999 U.S. Dist. LEXIS 22623, at *23 (emphases added).

To be voidable under Virginia Code § 55.1-401, the transfer must be made "by an insolvent *transferor or by a transferor* who is thereby rendered insolvent…." *Id.* (emphasis added). The elements required to establish a claim for voluntary conveyance are "(1) a transfer made *by the debtor* (2) for consideration not deemed valuable in law (3) while *the debtor* was insolvent or by which he was rendered insolvent." *Shaia v. Meyer*, 206 B.R. 410, 415 (Bankr. E.D. Va. 1997) (emphasis added); *C.F. Trust*, 1999 U.S. Dist. LEXIS 22623, at *10.

Here, GLAS complains of transfers *not* made by the debtor-transferor, but by other entities, including *Greensill UK itself*, GLAS's predecessor interest.  Put another way, GLAS complains of and seeks to avoid its own transfers.

### 1. The transfers to Carter Bank were *not* made by the debtor, but by Greensill

As Carter Bank argued in its Memorandum in Support of Motion to Dismiss, at pages 14-16, a plain reading of §§ 55.1-400 and 401 and Virginia case law interpreting those statutes demonstrates that a fraudulent or voluntary transfer must be made *by the debtor*—in this case at least one of the Bluestone Entities—and not by a third party. As the Supreme Court of Virginia observed in *Grayson*, "[t]hese statues [§§ 55.1-400 and 401] generally presuppose a conveyance *by the debtor* from the debtor's estate." 300 Va. at 49, 859 S.E.2d at 665 (emphasis added) (citing Kent Sinclair, *Sinclair on Virginia Remedies* 48-2[B], at 48-10 (5th ed. 2016) (describing the existence of "a transfer from the debtor's estate" as "[a] basic requirement).[19] Accordingly,

---

[19] The Supreme Court of Virginia further cited other treatises for the principle that the property must be transferred or disposed of by the debtor. *Id.*, n. 11 (citing 1 Dewitt C. Moore, A Treatise

transfers ***not*** made by the debtor do not qualify as fraudulent or voluntary transfers under Virginia law. *Id.*; *see also* Va. Code § 55.1-400 *et seq.* The statutes "seek to balance two competing public policies: 'the public interest that debts should be paid' and '***the debtor's*** freedom to alienate his own property.'" *Id.* (quoting Sinclair, supra, § 48-2[A], at 48-7) (emphasis added).

For the first two transactions, GLAS alleges that (1) on or about September 28, 2018, Bluestone Resources and/or Bluestone Coal "***instructed Greensill UK to transfer***" a total of approximately $68 million of RPA Funds to Carter Bank (Am. Compl. ¶ 76 (emphasis added)), and (2) on December 13, 2018, the Bluestone Entities "***instructed Greensill UK to transfer***" a total of approximately $179 million of RPA funds to Carter Bank. *Id.* ¶ 80 (emphasis added). Far from correcting the problem, GLAS's Amended Complaint now expressly pleads that the elements of §§ 55.1-400 and 401 are ***not*** satisfied, thus undermining its claims based on the September 28 and December 13, 2018, transfers.

Likewise, with respect to the third transaction, GLAS affirmatively alleges that the transfer to Carter Bank was ***not*** made by the debtor, the Bluestone Entities, but by other unrelated entities also owned by the Justices. Specifically, GLAS alleges that the Bluestone Entities made payments to third parties Tams Management and Justice Low Seam Mining (Am. Compl. ¶ 89). GLAS then alleges once, again "on information and belief," that those two entities (not the Bluestone Entities) "took the $38.6 million of RPA funds and then, as part of a single, integrated plan, transferred all, or a substantial portion of, that sum to Carter Bank to pay off their senior secured loans for which the Bluestone Entities were not legally obligated." *Id.* ¶ 89. GLAS does not allege any facts explaining or describing what is meant by a "single, integrated plan" or any factual basis for this

on Fraudulent Conveyances and Creditors' Remedies at Law and in Equity 3-4 (1908); Frederick S. Wait, A Treatise on Fraudulent Conveyances and Creditors' Bills § 15, at 34 (3d ed. 1897)).

allegation. Regardless, GLAS's allegations confirm that entities other than the insolvent debtor, Bluestone, made the transfers to Carter Bank, thus undermining GLAS's claim based on the third transfer to Carter Bank.

In short, the Amended Complaint fails to plead that the allegedly fraudulent transfers were made by the debtor, as required by Virginia law. Hence, Plaintiff's fraudulent and voluntary conveyance claims relating to the three transfers therefore must be dismissed.

2. Given Greensill's intimate involvement in transferring funds to Carter Bank, GLAS cannot plead any intent to defraud Greensill

Finally, the allegations of the Amended Complaint defeat GLAS's claims with respect to the first two transfers because Greensill UK itself—in whose shoes GLAS claims to stand—actually made those transfers directly to Carter Bank. Am. Compl. ¶¶ 76, 79. While GLAS asserts that Bluestone owed only $59.4 million *in total* to Carter Bank, Greensill UK quite clearly and directly transferred substantially more than this amount to Carter Bank, thus ***itself*** making the allegedly fraudulent transfer to Carter Bank. Compl. ¶ 65. Likewise, Greensill UK ***itself*** transferred the $179 million to Carter Bank in December 2018, at a time when it knew the Bluestone debt had been paid. GLAS does not allege that Greensill UK made these transfers under duress or under some misunderstanding as to whom it was transferring the funds or for what it was transferring the funds.  It does not allege that the $179 million was transferred by it to Carter Bank under some false pretenses. Greensill thus knew or should have known that the transfers were made for the purpose of satisfying debts owed to Carter Bank by entities ***other than*** the Bluestone Entities.[20]

---

[20] Although left unspoken by the purposely opaque nature of the allegations about these transfers, in fact Greensill UK knew with absolute precision that the purpose of this transfer of $179 million was to pay off non-Bluestone debt. In fact, Greensill UK specifically consented to use of the funds for that very purpose, as the documents in the case will show. Once again, should the Amended Complaint survive, this will be the subject of subsequent motion practice.

The natural result of GLAS's allegations that Greensill UK itself ***participated*** in the purportedly fraudulent transfers is that GLAS cannot plausibly allege that Greensill UK's first two transfers of funds to Carter Bank (on Bluestone's behalf) were intended to defraud Greensill UK. Indeed, GLAS is estopped from taking any such position. *See In re Abingdon Realty Corp.*, 21 B.R. 290, 292 (E.D. Va. 1982) (finding that a corporate entity was estopped from attacking a conveyance as fraudulent where the corporate entity was "charged with knowledge of the transaction from its inception" and had an identity of interest with the signers of the note); *see also Persichelli v. Metropolitan Paper Recycling Inc.*, 926 N.Y.S.2d 346, 346 (N.Y. Sup. Ct. 2010) (finding creditor had no legal standing to raise a claim for constructive fraudulent conveyance when he was a creditor with full knowledge of the conveyance); *Lavine v. Dorsey & Whitney*, 1997 Minn. App. LEXIS 243, *7-8 (Minn. App. 1997) ("Even a creditor may waive or be estopped from pursuing a fraudulent conveyance claim if it consents to the terms of the conveyance."); *In re Refco, Inc. Secs. Litig. v. CSFB*, 2009 U.S. Dist. LEXIS 129944, *44 (S.D.N.Y. Nov. 13, 2009) (holding that the plaintiff was estopped from bringing a fraudulent conveyance claim when it knew about the transferee's financial situation and was intimately involved with and voluntarily participated in the allegedly fraudulent transaction).

Given the allegations in the Amended Complaint, GLAS has not only failed to allege sufficient facts to support its fraudulent and voluntary conveyance claims against Carter Bank, but affirmatively pled facts demonstrating that it cannot prevail on these claims. Accordingly, GLAS's claims should be dismissed with prejudice.

## V.   CONCLUSION

For the reasons set forth above, Carter Bank respectfully requests that the Court dismiss Plaintiff's Amended Complaint against it in this matter.  Given the nature of the deficiencies in

the Amended Complaint and the fact that Plaintiff has already filed an amended complaint under

Fed. R. Civ. P. 15(a), the Court should deny Plaintiff any further amendment and dismiss this case

with prejudice.

Dated: May 13, 2024                  Respectfully Submitted,

                                     CARTER BANK & TRUST

                                     /s/ *Robert A. Angle*
                                     Robert A. Angle, VSB No. 37691
                                     Megan E. Burns, VSB No. 35883
                                     TROUTMAN PEPPER HAMILTON SANDERS LLP
                                     1001 Haxall Point, 15th Floor
                                     Richmond, VA 23219
                                     Telephone: (804) 697-1246
                                     Email: robert.angle@troutman.com
                                     Email: megan.burns@troutman.com
                                     *Counsel for Defendant Carter Bank & Trust*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 13th day of May, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a copy of the foregoing to all registered parties.

/s/ *Robert A. Angle*
Robert A. Angle, VSB No. 37691
TROUTMAN PEPPER HAMILTON SANDERS LLP
1001 Haxall Point, 15th Floor
Richmond, VA 23219
Telephone: (804) 697-1246
Email: robert.angle@troutman.com
Email: megan.burns@troutman.com
*Counsel for Defendant Carter Bank & Trust*

31

171497845